WILLIAM STUART, plaintiff in error, *v.* THE PEOPLE OF THE STATE OF ILLINOIS, defendants in error.

*Error to Cook.*

The jurisdiction of the Supreme Court embraces every case where a final order has been made by the Circuit Court, the effect of which may be to deprive a party of any of his rights.

In all criminal cases, not capital, the writ of error is a writ of right, and issues of course.

The proceeding against a party for a contempt of Court, is in the nature of a criminal proceeding.

A writ of error may be sued out of the Supreme Court, to reverse the decision of a Circuit Court, fining a person for contempt of Court.

Contempts of court are either direct, such as are offered to the court, while sitting as such, and in its presence, or constructive, being offered, not in its presence, but tending, by their operation, to obstruct and embarrass, or prevent, the due administration of justice.

The right in the courts to punish for contempts committed in the presence of the court, is acknowledged by statute, and while it affirms a principle that is inherent in all courts of justice, to defend themselves when attacked, it may be regarded as a limitation upon the power of the courts to punish for any other contempts. In this power would necessarily be included all acts calculated to impede, embarrass, or obstruct the court in the administration of justice. Such acts would be considered as done in the presence of the court. So, also, of rules entered by the

court, prohibiting the publication of the evidence, or other matters, whilst the case is pending and undecided.

Such portions only of the common law as are applicable to our institutions, and suited to the genius of our people, can be regarded as in force in this State.

AT the May term, 1840, of the Circuit Court of Cook county, the Hon. John Pearson presiding, the following entry was made of record:

"The clerk will enter a rule, and let the same be served on the said William Stuart, to show cause, by two o'clock P. M., the eighth day of May, why he, the said Stuart, ought not to be fined or imprisoned, or both, for publishing, in the Chicago Daily American, on May 7th, A. D. 1840, a contemptuous article of and concerning the jury and Circuit Court of Cook county, while sitting in relation to the trial of John Stone, charged with murder, while the said trial was in progress and still undetermined."

The following interrogatories were also exhibited to said Stuart, to be answered by him:

"April term, A. D. 1841, } *Contempt of Court,*
Cook Circuit Court. }

"In publishing, in the Daily Chicago American, certain contemptuous articles of and concerning the Court and jury, pending the trial of John Stone, for murder, on the 7th of May, 1840.

"Interrogatory first. Why did you publish, in said paper, on the 7th inst., the article referred to, of and concerning John Wentworth, a juror in the case of The People *v.* Stone, on his trial for murder, while serving as such juror? State the reason.

"Interrogatory second. Why did you publish, at the same time, the statement, in the same paper, that John Wentworth, a juror in said case, while sitting in that capacity, was writing editorial articles?

"Interrogatory third. Who informed you that the judge of this Court directed the officers of this Court to close the doors during the trial of Stone, to prevent all ingress and egress? If any person, state who.

"Also give the reason for such publication, and why you used this expression: 'One individual suggested that the weakness of his Honor's head would not admit of the noise and confusion incident to a crowd of hearers, and a proper attention to the cause, all at the same time.'

"A. HUNTINGTON, State's Atty.

"And afterwards, to wit, on the 9th day of May, A. D. 1840, the said defendant, by Butterfield & Arnold, his counsel, filed the following motion, to wit:

"And the said William Stuart comes and represents that he has been attached, as for a contempt of this Court, a copy of the rule

upon which the said attachment was issued being hereunto annexed. This respondent says, that from the said rule, and the interrogatories propounded to him, it appears that the alleged contempt consisted in the publishing an article in the Chicago American, on the 7th day of May inst.; and the defendant protests against the said arrest and jurisdiction of this Court, to commit or to proceed and punish for contempt, for the cause aforesaid, and respectfully prays he may be discharged from his arrest, and alleges the following grounds:

" 1. The act complained of is not, in law, a contempt of this Court.

" 2. The Court cannot legally punish, as for a contempt, a publication made in a newspaper, and not done in the immediate presence of the Court.

" 3. No publication, out of Court, in relation to the Court, or any of its officers, jurors, or witnesses, amounts, in law, to a contempt, and the same cannot be punished as such.

" BUTTERFIELD & ARNOLD,<br>" Counsel for Stuart.

" And thereupon, afterwards, to wit, on the same day and year last aforesaid, came the said William Stuart, and filed, upon oath, the following answers to the interrogatories propounded to him, as aforesaid, said answers being as follows, to wit:

" William Stuart *ads.* The People. } Cook Circuit Court, April term, A. D. 1841. } ss.

" 1. This respondent, William Stuart, being duly sworn, in answer to the first interrogatory propounded to him, to wit, ' Why did you publish, in said paper, on the 7th inst., the articles referred to, of and concerning John Wentworth, a juror in the case of The People *v.* Stone, on his trial for murder, while serving as such juror?' states, that assuming John Wentworth to be the person referred to as the editor of the democratic paper, and as the said juror intended in the article to which this respondent supposes the interrogatory refers—this respondent published the same because he knew it to be true, of his own knowledge, and can prove the same, by competent witnesses, if necessary so to do ; and because he deemed it to be an individual act of an individual juror, highly improper, and worthy of censure in his capacity of editor of a public journal. And this respondent, by said publication, did not intend to cast any contempt upon this Court, nor upon the said jury, as a body, but, on the contrary, he has declared and believes the said jury to have been a highly respectable and intelligent body.

" 2. In answer to the second interrogatory, to wit, ' Why did you publish, at the same time, in the same paper, the statement that John Wentworth, a juror in said case, while sitting in that

capacity, was writing editorial articles?' this respondent, again assuming John Wentworth to mean (in the language of the said article) the editor of the loco foco organ, who was one of the jury, states, that he published the same because he was informed, by one of the jury, that the same was true; that he believes the same to be true, and can prove the same, by competent testimony, if necessary so to do; and because he believed said conduct highly improper, and worthy of censure; that he referred to the same as the individual act of an individual juror, and intended, by said publication, to cast no contempt either on this Court or the jury. This respondent further states, in justification of the truth of said publication, that the following editorial article, which appeared in the Chicago Morning Democrat of May 7th, the same day on which the publication complained of was made, was written by the said John Wentworth, while sitting as a member of the said jury, as this respondent is informed, by one of the said jurors, and verily believes to be true, to wit:

" ' *Another Whig Victory.*

" ' Why has the editor of this paper been a Harrison man for the last three days?

" ' Because he has been under keepers, and allowed to express no sentiments, and answer no questions.'

" And this respondent would respectfully suggest and contend, that this respondent is not justly chargeable with any intention to cast contempt on this Court, or the said jury, by alluding to the fact of said publication, but intended to disapprove of the act of said Wentworth in writing and publishing, under the solemn circumstances of his situation, an inuendo of such levity against this Court and its officers, as his keepers aforesaid.

" This respondent further states, that the acknowledgement of the truth of the statement contained in the said last interrogatory, appeared, as editorial, in the Chicago Morning Democrat of the same date, to wit:

" ' The editor of this paper has been confined, as juror on the murder case, ever since Monday noon last, not being allowed to come to his office, though not hindered from sending articles thither, if they were sent through the sheriff.'

" 3. In answer to the third interrogatory, to wit, ' Who informed you that the judge of this Court directed the officers of this Court to close the doors during the trial of Stone, to prevent all ingress or egress?' this respondent states, that he has not, in his paper, declared that he was thus informed, by any person. The article alluded to was a communication, purporting to be one of enquiry, and signed ' Many Interested,' which this respondent received from the post office, and to which he annexed a comment, charging the said correspondent with a mistake. This respondent, however,

had heard some complaint made among the people, that the door, through which they generally passed into the court room, was closed some time during the progress of the trial; he had heard some of the officers of this Court declare that they had been instructed to prevent ingress or egress in the court room; he himself attempted to pass in through the door, when this honorable Court was in session, but could not succeed, and turned away, supposing that the Court was not in session, but a minute or two afterwards returned, pushed and tapped against the door, when it was unlocked by an officer thereat, and closed again.

" 4. And this respondent further states, in answer to the fourth and last interrogatory, that the expression mentioned therein is contained in the said communication, not written by this respondent, and that by the publication of the same, and of the comment thereto annexed, this respondent intended to cast no contempt on this Court, but merely, as an editor of a public journal, whose duty it is to inform and answer all interrogatories of his readers, on matters of a public nature, to allow a portion of the community, who felt themselves aggrieved in what they considered their rights, in a matter of a general and public nature, an opportunity to present their enquiries, and obtain, if possible, the information desired. This was all this respondent did, and, without intending to cast any contempt on this Court, he merely presented, what he conceived he had a right to do, a complaint which existed among at least a respectable portion of the community.

" This respondent, in the discharge of his duty as editor of a public journal, is often necessarily called upon to animadvert upon public men and measures. This duty he endeavors to discharge free from the bias of ill will, malevolence, or hatred, fear, favor, or affection. He considers the public acts of public men, in their public capacity, as the property of the people, and subject to all reasonable and true examination. It was the language of the celebrated Burke, ' that censure is the tax which a man pays to the public for being eminent,' and he indeed is fortunate, who, in his official career, is so far removed from the common infirmities of our nature, as to escape the assessment.

" The Constitution of this State expressly declares, that printing presses shall be free to every person who undertakes to examine the proceedings of the General Assembly, or of any branch of Government; and no law shall ever be made to restrain the right thereof; that the free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write, and print, on any subject, being responsible for the use of that liberty. It further declares, that in prosecutions for publications of papers in investigating the official conduct of officers, or of men acting in a public capacity, when the matter published is proper for public information, the truth thereof may be given in evidence.

" Under the protection and sanction of these high attributes of a free government, this respondent has only endeavored to repose; and, in the articles alluded to, he did not intend to violate the Constitution of this State, nor cast contempt upon this Court.

"WILLIAM STUART.

" Sworn to and subscribed, before me, this 9th May, 1840.

"RICHARD J. HAMILTON, Clk."

And thereupon the following further entry was made of record:

" This day come the people, by Huntington, State's Attorney, and the said defendant, by Butterfield & Arnold, his attorneys, comes and files his written motion herein for a discharge, which said motion is overruled by the Court, and thereupon the said Stuart files his answers to the interrogatories propounded to him.

" And after hearing said answers of said defendant, and the arguments of counsel, upon due consideration, the Court adjudge that the said defendant pay a fine of one hundred dollars, and the costs of this suit, and that the said plaintiffs have execution therefor."

The cause was brought to this Court by writ of error.

J. BUTTERFIELD and I. N. ARNOLD, for the plaintiff in error, relied upon the following points and authorities:

The act of the legislature of this State, R. L. 149, § 11; Gale's Stat. 169, is a limitation upon the common law power, if it existed, to punish for contempt. The courts can punish for contempt only as provided in that act.

The principle established by the Court below is, that an editor, who is also a juror, may write and publish what he pleases, but it will be contempt for another editor to answer him.

In the case of Judge Peck, it was held that his acts were unlawful; but he was acquitted on the ground that he acted ignorantly. See Peck's Trial 295, 402, 405, 437, 445, and last page.

They also cited State Const., Art. VIII., § § 22, 23; 11 Wend. 652; Crim. Code of Ill., § 189; R. L. 217.

A punishment for contempt is a conviction. *Ex parte* Carney, 5 Peters' Cond. R. 227; 1 Johns. 338, 467.

A writ of error will lie to a judgment for contempt. 6 Johns. 338; J. V. N. Yates' case, *Ibid.* 467.

This was a criminal case, and an appeal is a matter of right in all criminal cases not capital. Crim. Code, § 189. The Supreme Court has jurisdiction in all matters of appeal, error, or complaint, &c. Gale's Stat. 168.

There is no authority to show that a writ of error will not lie where a court exceeds its jurisdiction.

J. LAMBORN, *contra*, cited Gale's Stat. 173, § 30. The act of Congress restricts the power to fine for contempt done in the pre-

sence of the Court; our statute does not. This contempt was, in fact, offered while the Court was sitting. Meredith's Argument, Peck's Trial 328; Anderson v. Dunn, 5 Peters' Cond. R. 71.

As to contempts of court. 4 Blac. Com. 285; Peck's Trial 335, 350, 413, 520.

But courts may as well punish for contempts out of the presence of the court, as in it. There is no more danger of tyranny and oppression in the one case, than in the other. 1 Blackf. 166–7; 9 Johns.; 1 Bibb.

Two questions are to be decided in this cause:

1. Can the Court punish for a publication in a newspaper?

2. Can this Court review the decision of the Circuit Court imposing a fine?·

It has been universally practised in Westminster Hall, to punish summarily for publications in newspapers.

[Wilson, Chief Justice: Is not this an infringement of that clause of the Constitution guarantying the freedom of the press?]

I think not; nearly every State in the Union has a similar clause; and yet, in many of them, their courts have exercised the power. This has been done in New Hampshire, Tennessee, Missouri, and New York. In the cases cited in Peck's Trial 350–51: case of Darby 352; case cited from N. H. Rep.; case of Joseph Charless, in Missouri, cited in Peck's Trial; case of Patrick H. Ford, cited in same.

This provision of the Constitution only relates to criminal prosecutions; and the truth may be given in evidence in such prosecutions, but in the proceedings for contempt, this cannot be done, and ought not to be, because it is not considered as affecting the individual, but the Court. Whether the publication was true or false, is immaterial; because the Court, as a Court, must be protected, whether right or wrong.

The matter of the publication was a contempt. The answer to the interrogatories, by Stuart, was insolent and malevolent. It was calculated, and probably intended, to irritate the judge; while the answer apparently is very respectful to the Court, it really is a bitter sarcasm upon the judge.

J. BUTTERFIELD, in reply:

The cases referred to by the Attorney General, from the English books, are but the history of the exercise of an arbitrary power in the worst of times.

In the States where this power is exercised, they have no statute like our own.

A fine for a contempt is a judgment of the court, and error lies. 6 Johns. 456, where Coke Litt. is cited.

The statute of this State limits the power of the court to punish for contempts while sitting, and such acts as impede the administration of justice. The press cannot obstruct the administration

of justice, nor is this a necessary power, as we see in the Federal Courts of the Union, which are expressly prohibited by act of Congress, from punishing for contempts, for any act except that which is done in the presence of the Court.

The act of Congress, relating to contempts, of 1831, is merely declaratory of what the law was before the act was passed. The language of the law clearly shows this : shall extend only to acts done in its presence, &c.

By the statute, Gale's Stat. 169, 173, § § 11, 30, the Court may make an order, or rule, to prohibit the publication of the evidence in the progress of the trial, when the Court shall think that the publication will be productive of injury to the parties.

Most of the cases where courts have refued to review the decisions of the inferior courts, for contempts, have been brought before the courts by *habeas corpus;* and this is not the proper process to review such decisions.

A writ of error will lie to an award of a fine for a contempt of court. If the judge does not act within his discretion, the court may reverse his decision.   6 Johns. 456.

THE cause was argued at the December term, 1841, and continued under advisement till this term.

BREESE, Justice, delivered the opinion of the Court :

The record in this cause shows a proceeding instituted by the Cook Circuit Court, against the plaintiff in error, as editor and publisher of the Chicago Daily American, for an alleged contempt, in publishing an article in that paper, supposed to reflect upon the Court and jury, whilst engaged in trying a case of murder pending therein, at the May term, 1840.

The proceedings were commenced in the usual way, by a rule upon the plaintiff in error to show cause, &c., and interrogatories duly propounded, which were answered, and he adjudged to pay a fine of $100, and the costs.

Various errors are assigned, which need not be noticed in the order in which they are presented, it being considered sufficient to state briefly the general conclusions to which the Court has arrived upon the whole case.

There seems to be but two important questions presented for decision here, and the first is, does a writ of error lie in such case ?

By the act regulating the Supreme and Circuit Courts, (1) this Court has final and conclusive jurisdiction of all matters of appeal, error, or complaints, from the judgments or decrees of any of the Circuit Courts of this State, and from such inferior courts as may hereafter be established by law, in all matters of law and equity, wherein the rules of law or principles of equity appear from the

(1) Gale's Stat. 168.

files, records, or exhibits of any such court, to have been erroneously adjudged and determined; and this Court is authorized and enabled to take cognisance of all such causes as shall be brought before it, in manner aforesaid.

A construction has been given to this provision of the statute, by this Court, in the case of Sloo v. The State Bank, (1) where it is said, that whenever a decision takes place in any of the Circuit or inferior courts of record in this State, which is final, and of which a record can be made, and which decides the right of property, or personal liberty, complete jurisdiction is conferred on the Supreme Court to hear and determine the same.

And in the case of Wells v. Hogan, (2) this Court has said, that no particular form is required to render an order of the Circuit Court a judgment. It is sufficient if it is final, and the party against whom it may be entered up, subjected to injury thereby.

This statute, and these decisions upon it, would seem to be sufficiently comprehensive to embrace every case where a final order has been made by the Circuit Court, the effect of which may be to deprive a party of any of his rights.

The decision of the Cook Circuit Court, although it does not adjudge the plaintiff in error to be guilty of a contempt, is nevertheless a final order on the merits of a case then before it, and a fine was inflicted, subjecting his property to its payment, or in default thereof, to a deprivation of his liberty, by confinement in jail.

Perilous, indeed, would be the condition of the citizen, if he had not the privilege, in such a case, to have it reviewed by another tribunal, and defective would be our jurisprudence, if it afforded no means of relief.

It is declared by our statute, (3) in conformity with the common law principle, that, in all criminal cases not capital, the writ of error is a writ of right, and must issue of course. This proceeding for a contempt is in the nature of a criminal proceeding, and has been so adjudged in the case of Clark v. The People. (4) This case is relied on by the Attorney General, as authority for the position he maintains, that this Court possesses no power of review in cases of contempt. I do not think that case decisive of this, for the reason, that there the contempt was committed in the presence of a justice of the peace, whilst trying a cause, and the statute gave him power to fine for contempts, in a sum not exceeding five dollars, in such a case, and he had not exceeded his jurisdiction, as the record shows. Besides, no law of the State allowed an appeal in such a case, partaking of a criminal nature, and it was properly dismissed.

The General Court of Virginia, in the case of Stokely v. The

(1) 1 Scam. 440.
(3) Crim. Code § 189.

(2) Breese 264.
(4) Breese 266.

Commonwealth, (1) held, that it had jurisdiction in a case of fine imposed by an inferior court, for a contempt, and reversed the sentence of such court, on the ground that the party had not been guilty of a contempt.    And in Kentucky, in the case of Brickley *v.* The Commonwealth, (2) the appellate court there said it would correct an erroneous sentence, though it could not re-try the question of contempt.    It would have jurisdiction to entertain the writ of error, but would not enquire into the subject matter of the contempt charged.

So, in the case of Kearney *ex parte*, (3) the Supreme Court of the United States said it would not grant a *habeas corpus*, where a party has been committed for a contempt by a court having competent jurisdiction; and, if granted, it would not enquire into the sufficiency of the cause of commitment.    The inference is, that where there was an absence of jurisdiction in the inferior court, as to the subject matter of the contempt, it would enquire and discharge a party.

Upon the authority of this case, which is relied on by the Attorney General, we are justified in concluding, if the Cook Circuit Court had no jurisdiction, the judgment should be reversed.    Had it this jurisdiction?

Contempts are either direct, such as are offered to the Court while sitting as such, and in its presence, or constructive, being offered, not in its presence, but tending, by their operation, to obstruct and embarrass, or prevent, the due administration of justice. Into this vortex of constructive contempts, have been drawn, by the British courts, many acts which have no tendency to obstruct the administration of justice, but rather to wound the feelings, or offend the personal dignity of the judge, and fines imposed, and imprisonment denounced, so frequently, and with so little question, as to have ripened, in the estimation of many, into a common law principle; and it is urged, that inasmuch as the common law is in force here, by legislative enactment, this principle is also in force. But we have said, in several cases, that such portions only of the common law as are applicable to our institutions, and suited to the genius of our people, can be regarded as in force.    It has been modified by the prevalence of free principles, and the general improvement of society, and whilst we admire it as a system, having no blind devotion for its errors and defects, we cannot but hope, that in the progress of time, it will receive many more improvements, and be relieved from most of its blemishes.    Constitutional provisions are much safer guaranties for civil liberty and personal rights, than those of the common law, however much they may be said to protect them.

Our Constitution has provided that the printing presses shall be free to every person who may undertake to examine the proceed-

(1) 1 Virg. Cases 330.        (2) 1 J. J. Marsh. 575.        (3) 7 Wheat. 88.

Stuart v. The People.

ings of any and every department of the Government, and he may publish the truth, if the matter published is proper for public information, and the free communication of thoughts and opinions is encouraged.

The contempt, in this case, was by a printer of a newspaper, remarking on the conduct of an individual juror, who, whilst he was engaged in the trial of a capital case, and whilst separated from the public, and in charge of the officer of the Court, was furnishing articles for daily publication in a rival newspaper; and in admitting a communication from a correspondent, calculated to irritate the presiding judge of the Court, though not reflecting upon his integrity, or in any way impeaching his conduct. The paragraphs and communication published had no tendency to obstruct the administration of justice, nor were they thrust upon the notice of the Court, by any act of the plaintiff in error.

The right to punish for contempts committed in the presence of the Court is acknowledged by our statute; (1) and while it affirms a principle that is inherent in all courts of justice, to defend itself when attacked, as the individual man has a right to do for his own preservation, it may also, with great propriety, be regarded as a limitation upon the power of the courts to punish for any other contempts. In this power would necessarily be included all acts calculated to impede, embarrass, or obstruct the Court in the administration of justice. Such acts would be considered as done in the presence of the Court. So of rules entered by the Court prohibiting the publication of the evidence or other matters while the case is pending and undecided. The limitation of the power to such cases only, is better calculated to strengthen the judiciary, and fasten it in the affections and esteem of the people, who have so large a stake in its purity and efficiency, than the enlarging the power to the extent claimed.

An honest, independent, and intelligent court will win its way to public confidence, in spite of newspaper paragraphs, however pointed may be their wit or satire, and its dignity will suffer less by passing them by unnoticed, than by arraigning the perpetrators, trying them in a summary way, and punishing them by the judgment of the offended party.

It does not seem to me necessary, for the protection of courts in the exercise of their legitimate powers, that this one, so liable to abuse, should also be conceded to them. It may be so frequently exercised, as to destroy that moral influence which is their best possession, until, finally, the administration of justice is brought into disrepute. Respect to courts cannot be compelled; it is the voluntary tribute of the public to worth, virtue, and intelligence, and whilst they are found upon the judgment seat, so long, and no longer, will they retain the public confidence.

(1) Gale's Stat. 173.

If a judge be libelled by the public press, he and his assailant should be placed on equal grounds, and their common arbiter should be a jury of the country; and if he has received an injury, ample remuneration will be made.

In restricting the power to punish for contempts, to the cases specified, more benefits will result than by enlarging it. It is at best an arbitrary power, and should only be exercised on the preservative, and not on the vindictive, principle. It is not a jewel of the court, to be admired and prized, but a rod rather, and most potent when rarely used.

The whole case being presented to this Court, in the same form and manner in which it was presented before the Circuit Court, we are satisfied that no contempt was committed, of which that Court could take jurisdiction, and accordingly reverse the judgment.

DOUGLASS, Justice, dissented, and CATON, Justice, not having heard the argument, gave no opinion.

*Judgment reversed.*