## Case No. 12,605.

### SECOR v. TOLEDO, P. & W. R. CO.

[7 Biss. 513; 4 Law & Eq. Rep. 283; 9 Chi. Leg. News, 393. 409; 2 Cin. Law Bul. 223; 25 Pittsb. Leg. J. 14.] [1]

Circuit Court, N. D. Illinois. July 31 and Aug. 29. 1877.

CONTEMPT — INTERFERENCE WITH PROPERTY IN HANDS OF RECEIVER—INTERFERENCE BY STRIKERS.

1. Property held in trust by the court for the purpose of protecting it pending its foreclosure, and over which a receiver has been appointed, is in the possession of the court, and any interference with it is punishable as a contempt.

2. Where a railroad is in the hands of a receiver, and the employés of another road who have struck, or any other persons prevent the employés of the receiver from working, they commit a contempt of court and are to be treated in as summary a manner as if the contempt were committed in the actual presence of the court.

[Cited in U. S. v. Anon., 21 Fed. 770; Thomas v. Cincinnati, N. O. & T. P. Ry. Co., 62 Fed. 816. Cited in brief in U. S. v. Debs, 64 Fed. 738. Cited in Re Acker, 66 Fed. 295.]
[Cited in Quidnick v. Chafee, 13 R. I. 430.]

[This was a bill in equity by James E. Secor against the Toledo, Peoria & Warsaw Railroad Company.]

A bill was filed in 1874, in the circuit court of the United States for the Northern district of Illinois, for the foreclosure of a mortgage, given by the Toledo, Peoria & Warsaw Railway Company, and in January, 1875, a receiver was appointed by the court to take charge and possession of the railway and other property of the corporation, who was required by the court to operate the road. The receiver soon after entered upon the discharge of his duties, and has ever since, with the exception hereafter named, operated the road as the officer of the court. During the railroad strikes, which occurred during the latter part of July, the employés of the Toledo, Peoria & Warsaw Railway Company did not in any manner participate in the disturbances. They were at all times willing to perform their duty, and continued their work till prevented by force or intimidation of others not connected with the railroad. Fearing that violence would be used to obstruct the running of trains, application was made to the court for assistance to keep and retain possession of the railroad property in the hands of the receiver, and an order was accordingly made by the court conferring the necessary authority on the marshal to accomplish that object. Notices were conspicuously posted in Peoria, advising all parties of the fact that the railroad was in the custody of the court, and that all interferences with it by unauthorized persons would be summarily punished. A deputy of the marshal was sent to Peoria on the 26th of July, with instructions to carry into effect the orders of the

1 [Reported by Josiah H. Bissell, Esq., and here reprinted by permission. 4 Law & Eq. Rep. 283, contains only a partial report.]

court. On that day a mob of strikers and others, at Peoria, assembled at the depot, some with clubs. sticks and other weapons, and by threats and force took possession of the trains of the company, and arrested for a time all the operations of the road. They refused to permit the employés of the company to attend to their usual services in the conduct of trains, but on the contrary, took forcible control of them either by themselves or by intimidation of the employés of the company. Mack, one of the defendants, was particularly active in obstructing the running of the cars, and was known to be one of the principal leaders. Several of these persons were attached, as for contempt, in interfering with the property in custody of the court, through its receiver, and a hearing was had before the circuit and district judges. By common consent the witnesses for and against the alleged obstructionists, as well as themselves, were heard orally in court. It appeared satisfactorily, as well by the proofs introduced as by the admissions of the parties, that they had all taken part more or less actively in the stoppage of trains.

[2] [The court held, in accordance with all the authorities, that the appointment of the receiver, and the order to him to take possession of and operate the road, was exclusive in its character, and by its terms necessarily prohibited all interference with the road by unauthorized persons, and that such interference was of itself a contempt of the court and of its authority. The custody of the receiver was that of the court. The court further ruled that these parties must be presumed, as in other cases, to intend what was the necessary result of their acts; that obstructing the railroad trains of the company by force, and preventing their employés, by intimidation and threats of personal violence, from continuing their work, was not only illegal, but criminal, and it was not competent for them to say that they did not intend a contempt of the court. That was a conclusion of law from an act done. A man could not enter the court and insult suitors and witnesses, and then escape from the consequences of the contempt committed by claiming, even though such was the fact, that he believed he was only in the presence of another court, as a mayor's or a justice of the peace. And as a man, by perpetrating some outrage in an ordinary assembly, as a public meeting, would not be guilty of a contempt of court, even though he might believe he was in the presence of a court, so, on the other hand, if it were done in court, it would not cease to be a contempt of its authority, how much soever he might be persuaded he was not in its presence. Whether it was a willful and persistent contempt would be for the court to consider in meting out punishment for the offense. The position of the court, then, was that these defendants, in taking possession by violence of the trains of the company, and by intimidating the employés, and thereby preventing the receiver from executing the orders of the court, were guilty of a contempt of court, and that if they were informed of the fact of the possession of the receiver as the officer of the court, it was an aggravation only of the offense, and did not of itself constitute the offense.] [3]

Mark Bangs, U. S. Dist. Atty., for the United States.

J. N. Jewett, for receiver.

Michael C. Quinn, for defendants.

DRUMMOND, Circuit Judge. I think the evidence in this case leaves no doubt that all these persons participated in a common object, which was to prevent the running of the trains of the Toledo, Peoria & Warsaw Railway Company. On the evening of Wednesday, the 25th of July, there was a meeting where Mack and Ennis, two of the defendants, were present and took part, the object of which was to prevent the operation of the railroads at Peoria. That purpose seems to have been carried out on the following day; and others from some cause or other, were induced to join them in this common object. It is a little remarkable that not one of these men now before the court was actually in the employ, at the time, of any railroad company, and that but one of them seems to have ever been employed by a railroad company at Peoria. Mr. Ennis, a short time before, had been employed by the Toledo, Peoria & Warsaw Railway Company.

We all acknowledge the rights of labor. It is simply the right of the man who performs labor to obtain the best price he can from his employer, and not to dictate terms to the employer. The rights of labor result from an agreement made among men, not by an order, or a dictation from one man to another. The rights of labor as thus understood, we all admit, and it is not improper perhaps, to call those rights sacred. But when it is claimed that the right of labor consists in not only refusing to labor, but in interfering with the labor of others we, of course, can have no feeling of respect for any such right as that. It is unlawful; it is criminal; it affects all the relations of life, and strikes at the root of everything in which the right of labor consists. I suppose that it was under the claim of protecting the rights of labor that these men interfered with the right to labor of the employés of the Toledo, Peoria & Warsaw Railway Company.

This was the pretext. But how absurd and unreasonable it was, we all must now acknowledge. It is impossible for the court to lose sight of the consequences of the acts of these defendants. It was not interference merely with private property, held by an individual, which had simply a private object to accomplish, but it was interference with

---

[2] [From 9 Chi. Leg. News, 393.]

[3] [From 9 Chi. Leg. News, 393.]

property which had a public object to accomplish. It was employed in transporting property, persons, and the United States mail. It was at once a means of communicating intelligence and carrying on the business of the country. These railroads are among the principal means of modern civilization by which the business of a country is transacted. Therefore when a man interferes with a property whose object is so important, which affects so materially all the relations of society, he commits as great an offense against the rights of individuals and against the rights of the public, as can well be imagined.

It is impossible to estimate the damage which has been done to this country within the last ten or fifteen days by just such acts as these defendants have performed. We have to consider further that these defendants have interfered with a property held in trust by this court, for its protection while a proceeding by foreclosure was going on for the purpose of enabling those who have a right to the property to obtain it by purchase by decree of this court. While thus in possession of the court, it is like public property, and the court can allow no interference whatever with it from any foreign source. The receiver who holds it is the officer of the court, and can do nothing with it without sanction of the court.

And then, in relation to the transportation of the mails by means of railroads: It is true that it appears by the evidence in this case that these defendants were willing that the mail car should go, but it must be borne in mind that the mail car can only go in such a way as to enable the railroad to transport the mail, when there are other cars accompanying it. It is not practicable, as a general thing, for a railroad to transport a mail car by itself, because that would be attended by serious loss. So that, while nominally they permitted the mail car to go, they really, by preventing the transit of other passenger cars, interfered with the transportation of the mail.

It is not usual in cases of this kind for a court, even though it is clear that there has been an unwarrantable interference with the property held by it, to impose very severe penalties, provided the parties manifest regret and repentance for what has been done. It is to be presumed that all these parties who participated in this act of violence do now regret what they have done. But in one sense every offender regrets after he has committed an offense, and particularly if he sees that punishment or penalty will follow. These men all knew that they were doing wrong. It is not possible, if they possessed ordinary intelligence, that they did not know that they were violating the law; that the tendency of what they did was to interfere with all the business of the country and do incalculable injury to the whole community.

What I wish to impress particularly upon them is, that it is incomprehensible to every man of any intelligence, any man who can sympathize even with what are sometimes called the wrongs of labor, that there can be any pretense of right in preventing other men from labor. As I said before, it is an absurdity to say that you can protect the rights of labor by trampling upon the rights of labor. All these men were willing to work for this railroad. They were willing to run these trains. They were prevented from running them by these defendants and men who acted in co-operation with them.

We all admit what is called the hardness of the times. We know that the business of the country has been disturbed; that for men who are willing to labor, it is difficult at all times to find an opportunity to labor, or to get such compensation for their labor as they desire. But when we hear of the compensation which is actually given to many of the employés of our railroads, we certainly must be somewhat surprised at the dissatisfaction which is shown by so many of them. I venture to say that a majority of the people of this country live and support their families on much less than is given to many of the employés of the railroads. It would be well to call to mind how many of the people of this country live on $400, $500, $600, or $700 a year, and support their families.

While we admit, therefore, that there may be some reason for dissatisfaction, still there are two sides to every question of this sort, and it is one of those questions that must be settled by a common agreement between the employer and the employed—by the demand and supply of labor. And this must be borne in mind, that we cannot change the nature of man. We cannot change his capacity and habits. We cannot make all men alike. Superiority of talents, of skill, of industry, of capacity for business, will always have its influence. It cannot be expected, therefore, that even all those men who will labor, are able to, or will, obtain the same price. There must be differences. Different kinds of labor receive different kinds of compensation. It is not possible that brakemen or switchmen can obtain as much as the superintendent. But it is one of the glories of our common country that every man, if he will only exercise the talents and the industry which he possesses, has the opportunity for rising as high as his talents, his industry and his capacity for business will enable him.

We have the custody and control of this property. It is seldom that it has been necessary for a court to interfere by the infliction of punishment upon those who have unlawfully and wrongfully obstructed the operations of a railroad, or, indeed, of any property which is in the hands of the court. In punishing these defendants we simply discharge a public duty. A public example must be made, and it must be made emphatically, from the nature of the offense which these defendants have committed—the interference with the whole public business of the country. In this

circuit there is a large number of railroads in the control of the court. Any interference with the running of those roads, any obstruction to a train interrupts the business of the whole northwestern country; prevents men from communicating with each other. It prevents merchandise from passing from point to point. It is, therefore, indispensably necessary that the court should not tolerate any interference, however slight, with the management of railroads thus in its custody. At the same time the court does not lose sight of the tempest of folly, and passion, and crime—because we must characterize it as crime; the law so regards it—which has swept over the country; we are not insensible to the influence which that may have over unthinking men.

But this thing must be stopped, and, so far as this court has the power to do it, it shall be stopped. We feel, both of us, that we would be wanting in the duty which we owe to the public and to the ultimate owners of the property which we have thus in possession, if we did not visit with severe punishment those who interfered with it. A fine imposed upon these men would really be no punishment, for I suppose most of them, perhaps all them, are unable to pay a fine. The only punishment that we can impose upon them is imprisonment. That is something they can feel and understand, and that, although not usual in cases of this kind, still, owing to the considerations that I have already mentioned, we feel that we must inflict upon these defendants. There is a difference among them. Mack, one of them, seems to have been the principal leader, and he looks as though he might be the leader in such a mob. He seems to have assumed his natural position. He therefore was pre-eminently guilty of the offense of which all are guilty. Ennis, who perhaps committed an overt act, more criminal, in one sense, than any of the rest of these defendants—namely: by drawing a weapon and threatening to shoot an engineer—seems to be a man who is in the habit of drinking too much, and was under the influence of liquor at the time, so as to affect his reason. But for that, he perhaps would have been equally guilty with Mack.

The defendant Mack will be imprisoned in the jail of the county for four months, and the others for two months, subject to the further order of the court.

Upon a further hearing of the case, August 29, 1877, the court gave the following opinion:

DRUMMOND, Circuit Judge. The defendants were brought before the court some time since, for being engaged with others at Peoria, on the 26th of July last, in forcibly stopping the trains of the Toledo, Peoria & Warsaw Railway Company, then in the possession of a receiver appointed by the court, and for preventing by intimidation and violence, the employés of the company from performing their duties in the running of the trains. They were found guilty of the offense, and a penalty imposed by the court.

The order of the court, appointing the receiver and putting him in possession of the railway and its appendages, required him to operate the road; indeed, he was appointed receiver for that special purpose among others; and the possession was exclusive in its nature—that is, it in effect prohibited any disturbance of the possession by unauthorized persons, so that the order of the court placed the railway in the possession of the receiver more effectually, if possible, under its safeguard and protection than personal property in the hands of the marshal, held by virtue of an ordinary process, which requires him to do some specific act in relation to it. This is not usually ordered directly by the court, but is issued by the clerk at the instance of counsel, or of the party, and the court or the judge may in fact have no knowledge of its existence. But it is issued under the seal of the court and by its authority, and when the officer holds property under it, the process is a protection, both to him and to the property. Where property is delivered to a receiver, the authority of the court is directly impressed on it by its order or decree, entered of record, which is considered notice to all persons that it is in custody of the court through its receiver. The marshal, under ordinary process, holds the property for a limited time, subject to the requisition of the writ. The receiver holds it under a continuing order, which remains in force till rescinded or modified by the court.

The possession by a receiver of a railroad is not like the ordinary case of his possession of an estate or of a house to collect rents. The obligation cast on the receiver by the decree of the court is personal, and demands the continued, hourly control of the rolling stock by him, and therefore it is that any forcible deprivation, even for a time, arrests the order of the court by taking from him the means of compliance. The property being thus in possession of the court, it becomes its duty to protect the receiver in its use by all the means in its power, and if he is deprived of it, to restore it to him by the necessary orders or writs of assistance to the marshal. And if that is unavailing, it can call on the general government to aid in enforcing its lawful process or orders. And among the means at the disposal of the court are summary proceedings against persons who unwarrantably interfere with property in its custody in disobedience of its orders.

Therefore, it is, that it has been considered by all the authorities, the supreme court of the United States among others, that any wrongful disturbance of the possession of property held by a receiver, is a contempt of the authority of the court, and punishable as such. So rigid is the rule that the court will not tolerate a seizure of the property by the process of another court, even though it may appear the party seeking it may have the

right to it. Any one having a claim on it must make it in the court that holds the property, or obtain its authority to sue elsewhere.

The right of a court to punish summarily by fine or imprisonment for contempt of its authority, is undoubtedly a power requiring great caution in its exercise, but it has always been considered, that in some form and with some limitations it ought to exist. The court must have the means without delay to protect itself, its process and the property in its custody by punishing those who wrongfully and forcibly disturb the possession held under its authority. Something must be left to the discretion of the court. It must be a legal discretion uninfluenced by passion or feeling. The object must be to maintain its authority for the present, and in the future—not merely to punish. When this is attained, penalty should cease. The court should decide it as free from personal feeling as though it were a mere question of property between parties litigant.

Under our federal judicial system the power of the court to punish for contempt is limited to the misbehavior of any person in its presence or so near as to obstruct the administration of justice; the misbehavior of its officers in their official acts, and the disobedience or resistance by any person to any lawful writ, process, order, rule, decree or command of the court.

In addition to the order of the court placing the railway in possession of the receiver, there was on the 26th of July a special order of the court requiring the marshal to prevent any interference with it and to assist the receiver in retaining it, and restore it if he were deprived of the possession. But if the marshal in restoring the property to the receiver, took possession of it, he, like the receiver, would hold it under the authority of the court, the difference being in the one case, as in the ordinary writ of assistance, it would be held by the marshal to be delivered to the receiver, and in the other by the receiver to execute the orders of the court, prescribing his duties pending the litigation—each being the officer of the court subject to the performance of his own special functions.

Such has been the embarrassed condition of the railroads in this part of the country within a few years past, that many of them are in the possession of the circuit court of the United States for this circuit, the gross annual earnings of which amount to more than fifteen millions of dollars. This statement shows the magnitude of the interests intrusted to our care. The theory is that our possession is only temporary, but there is generally such a multitude of claims to be adjudged in each case, and so great are the difficulties in arranging conflicting rights among the mortgagees preparatory to a sale and reorganization, that it sometimes happens in spite of the earnest efforts of the court to hasten the sale by foreclosure, that they remain in the custody of the court for some years. The Toledo, Peoria & Warsaw Railway Company has been in the hands of a receiver for more than two years.

It will be seen, therefore, that the forcible interruption of the traffic of so many railroads for days, was a very serious matter, and the judges were of opinion, after the fact, that it was not possible to pass by so great an outrage upon the rights of property in our possession, by a reprimand or mere nominal punishment of the guilty persons. If it had been a few cars or engines that had been interfered with, it would have been different, but there was the business of many railroads, for a time struck down by men who bade defiance to the law and to the authority of the court. There seemed to be a necessity to exercise the power vested in the court. If such things could be repeated, then was not only a great wrong done to those whose interests we were obliged to protect, but the government itself had ceased to accomplish one of the chief objects of its creation.

We could take no part in any supposed conflict between capital and labor, if there can be a conflict in a country where the laborer of to-day may be the capitalist of to-morrow. All men are equal before the law. Neither the capitalist nor the laborer has a right to violate it. We personally desire that the laborer in all departments of life should obtain adequate reward for his services. What that should be, it was not for us as a general question to decide. We can only say that we found no sufficient excuse for the wrong done to the property in possession of the court. The men who committed it had no claim whatever to it, and if they had, the result would have been the same. Those who may be said, in one sense, to own the property of the Toledo, Peoria & Warsaw Railway Company, and who will be entitled to its proceeds when sold, are the bondholders under the mortgages, but though many of them may be capitalists, still even they would be guilty of a contempt if they violently took possession of the property while in the custody of the court. It is the act committed that constitutes the offense, whether by capitalists or strikers, the forcible seizure of property not in the possession of an individual or of a corporation, but of the court.

But while these circumstances have influenced us to impose a penalty, we do not desire to continue it, if the purpose has been effected—the maintenance of the authority of the court and the prevention of similar offenses hereafter. And after due consideration we have come to the conclusion, the court still being in session, that we may remit the penalty and discharge the defendants.

The railroads have resumed their ordinary traffic. There seems at present no danger of future trouble. Railroad employés have returned to their duties. It is to be hoped that the lessons of the time have not been lost on the public, nor on employers or employés. The defendants have expressed regret for

what has been done, and promise that the offense shall not be repeated. And then it is to be remembered that we consider only the disobedience of the orders of the court and not the general criminal act. And though the wrong done was great, still it is but justice to say that at Peoria, as elsewhere in this circuit, there was no destruction of property as at Pittsburgh; on the contrary, there were in some places earnest efforts made by the strikers to preserve property.

Again, we do not lose sight of the fact that at Peoria, as elsewhere in the circuit, persons who aided in depriving the receiver of control over the property, did not fully realize the nature of the offense as against the court. They must to a great extent be held answerable for all the consequences which followed from their wrongful and violent acts, but it must be admitted that after a time, when they fully comprehended that they were obstructing the orders of the courts and the possible results, they relinquished the control of the trains and allowed the receiver to retake possession. In Peoria this was sooner accomplished than in some other places. So, that in view of these considerations, and with the concurrence of the district attorney and the counsel of the receiver, all the defendants will now be discharged, on each one giving his own recognizance to observe the laws of the United States, and to abstain from all wrongful interference with any property in the possession of a receiver of this court, for one year from this time.

NOTE. See, also, King v. Ohio & M. Ry. Co. [Case No. 7,800].
The authorities on the subject of contempt of court by interfering with property in the hands of a receiver can be found in 2 Daniell, Ch. Prac. 1743, and in High, Rec. §§ 163–174.