## UNITED STATES *v.* ANONYMOUS.

*(Circuit Court, W. D. Tennessee.* October 6, 1884.)

1. CONTEMPT—REVISED STATUTES, § 725—INTERRUPTING EXAMINATION OF WITNESS—INSULTING THE EXAMINER.

It is a contempt of court to interrupt and violently break up the examination of a witness before an examiner by persisting in the claim to dictate, prompt, and control the answers of the witness. It is also a contempt to insult the examiner by the use of violent and abusive language to him after he has left the office and is upon the street. Nothing in the Revised Statutes, § 725, has taken away the power of the court to punish such contempts.

2. SAME SUBJECT—PRACTICE—ANSWER OF RESPONDENT.

Technically, the practice of a federal court of equity, in matters of extraordinary contempts, is to proceed, on motion and proof, by ordering that the offender stand committed, or be fined, unless he shall, on a day assigned, show cause to the contrary. But this practice has been superseded by converting a preliminary rule to show cause why an attachment should not issue into a procedure for trying the whole matter on its merits. But under neither practice is the answer of respondent to this rule or to interrogatories conclusive, as at law, in his behalf; but, on the contrary, the court will, for itself or by reference to a master, ascertain the facts by proof, taken in any way to suit the convenience of the court.

In an equity cause pending in this court, in which a large amount of written testimony in the form of depositions was to be taken in short-hand, a decree and order was made appointing the regular examiner of the court to take the proof of witnesses residing here, and many depositions had been taken by him; and others were being taken, when, on May 2, 1884, the examiner made a report to the court of certain alleged misconduct on the part of respondent, who was attending the examination of witnesses before the examiner in a law office in this city, the respondent being a defendant in said equity cause,

the guardian *ad litem* of certain other of the defendants and of counsel for the defense. The court thereupon, of its own motion, upon the presentation and filing of said report, directed the issuance of a rule upon the respondent requiring him to appear before the court on a day named therein and show cause in writing why he should not be punished as for a contempt of the court because of his alleged misconduct. By the same order. the district attorney was directed to appear and prosecute on behalf of the United States. This rule was duly served by the marshal, as appears by his return under oath. On May 9, 1884, the return-day of the rule, the respondent not appearing or showing any cause in writing or otherwise, an attachment was ordered and issued for his arrest; and on the same day permission was given the district attorney to file affidavits of the examiner, of the facts set out in his report. These affidavits are as follows, omitting the mere formal commencement:

That the respondent, on—

"The first day of May, A. D. 1884, at Memphis, in the county of Shelby and state of Tennessee, and in the Western district of Tennessee, was guardian *ad litem* of certain defendants, and was also personally a defendant in said equity cause then and now pending in said court at said Memphis, and was then and now solicitor and counsel for the defendants therein, and that affiant was then and there and now an examiner in chancery for said court in said cause; that then and there, at the law office of P. & P., in said Memphis, the deposition of Mrs. D. was being taken for the defendants in said cause, she being a defendant and the mother of the said respondent, before affiant, as such examiner, in the presence of respondent and F., of counsel for defendants, and of E., of counsel for complainants; that after the direct examination of said Mrs. D. in her said deposition, and during her cross-examination therein, the said respondent (guardian *ad litem*, defendant, and counsel as aforesaid) did then and there interfere with and interrupt the said cross-examination by questioning, prompting, and conversing with the witness as to her testimony in her said deposition, and this notwithstanding the objection and request and protest of affiant, and the requests of said witness and said E. and F., on account of which conduct and misbehavior of the said respondent, and because he persisted therein and openly declared that he would not desist therefrom, the taking of the said deposition was interrupted and stopped, and counsel for defendants, the said F., because of said misconduct, left the office, declining to proceed with the deposition, after which said E. also retired, after requesting affiant to report the matter to the court; that after the said F. and E. had left said office, as stated, the respondent, in the presence of the said Mrs. D. and affiant, (then and there examiner, as aforesaid,) used indecent language of said E., calling him 'a son of a bitch' and 'a damned son of a bitch,' when affiant left the office to avoid listening to such foul language in the presence of Mrs. D. Soon after, at the request of said F., affiant returned to the office, when said respondent, in their presence, repeatedly swore he would 'kill that God-damned son of a bitch,' (meaning said E.,) shaking his fist, in which he held an open knife, towards said E., who was then walking up the street at a distance from respondent, and probably not within hearing. Thereupon affiant refused to proceed with the taking of depositions in said cause under such circumstances, when said respondent cursed affiant and told him to 'go to hell,' still holding in his hand the open knife. The interruption in the taking of said Mrs. D.'s deposition, and the reason why it was so left unfinished, was due wholly to the misbehavior

and misconduct of said respondent, he then and there being, as aforesaid, counsel, defendant, and guardian *ad litem* in said cause."

Under the process of attachment, the respondent was arrested by the marshal, and gave bail for his appearance, as in an ordinary criminal prosecution in the court; the amount of the penalty of his bond being fixed by the court at $500. On May 20, 1884, the respondent filed, under oath, his response or answer to the report and affidavits of the examiner, which is as follows:

"For answer the said respondent says that it is true that he is guardian *ad litem* for certain defendants in said cause, and one of the defendants in said cause, and also one of the solicitors in said cause, and was such before and at the time of filing said affidavit. And he further says the affiant was then examiner in chancery for said court in said cause; that the deposition of Mrs. D. was being taken for defendant in said cause, the said examiner acting as such in taking the same; that she was one of the defendants in said cause, and the mother of respondent; that F. was also of counsel for said defendants in said cause, and E. was of counsel for complainants in said cause. It is true that the examination of said witness in chief was completed. But it is not true that after the direct examination of said Mrs. D., in her said deposition and during her cross-examination therein, that respondent did then and there interfere with and interrupt the said cross-examination by questioning, prompting, and conversing with the witness as to her testimony in the said deposition, and this notwithstanding the objection and request and protest of affiant, and the requests of said witness and said E. and F., and on account of which conduct and misbehavior, and because respondent persisted therein and openly declared that he would not desist therefrom, the taking of said deposition was interrupted and stopped; and counsel for defendants, said F., because of said misconduct, left the office, declining to proceed with the deposition. It is true that said F. did retire pending said cross-examination. It is true that afterwards said E. did retire, and that before retiring he requested said examiner to make report of the proceedings to the court. But it is not true that respondent was guilty of any act or conduct contrary to the form of the statute of the United States in such cases made and provided. Respondent, as counsel in said cause, upon said cross-examination, was of opinion that the cross-examining counsel was transcending the limits of legitimate cross-examination, and was seeking to entrap and confuse the witness, and to confound what she knew of her own knowledge with what she knew from hearsay; and he made, as he thought he had a right to do, objection to such examination as the objectionable questions were propounded, and sought, as he believed in a proper mode, to have them corrected; and he and his associate counsel differed as to whether the proper practice was to have such matters corrected as the examination proceeded, or to wait until the cross-examination had been concluded, and then by re-examination to undertake to have the necessary explanations and corrections made.

"Respondent was firm and decided, but not offensive, in his view, to the examiner, to said E. or to said F., and because of this position of respondent, which said F. believed wrong and would be hurtful to the case, or, at least, productive of no good, said F. declared if respondent did not yield and come over to his view that he would retire and leave respondent alone as counsel for defendants to continue the further examination of the witness; and said F. did accordingly leave, for the causes stated by respondent, and not for the causes stated in the affidavit of the examiner. After he retired said E. also retired, for the causes stated by respondent, and not for those stated by the examiner, and requested the examiner to report the matter to the court. Re-

spondent denies that in this matter he showed any contempt or want of respect for the authority of the examiner, or any want of respect or contempt for the court, under whose authority the examiner was acting. He denies all purpose whatever of contempt, or of defying the authority of the court or its examiner, or the due and proper execution of its orders. He thought that his action as counsel in the matter was proper and in good faith, urged it, and in so doing differed with his associate for the defense, for whom he then entertained and now entertains the warmest regard. It was not his purpose to wound or annoy him or the solicitor for complainants or the examiner, or to act in a spirit of disobedience or contempt for the court or its examiner, or its orders; and he disclaims, disavows, and positively denies that he entertained such purpose, or was guilty of any word or act which makes him a contemnor of the court or its examiner or its proceedings. He regrets that his disagreement with his associate counsel led to the suspension of the deposition, and to a total misconception of his motives and purposes. For further answer respondent says that after said F. and said E. had left the office of P. & P., as stated, and after it was announced that the further taking of the deposition was suspended, and said examiner had been requested to report to the court by said E., and the examiner had declared he would do so, respondent admits that he called said E. a son of a bitch, but not a damned son of a bitch; that the said Mrs. D. was then present, and respondent supposes the examiner was also present. But respondent meant no disrespect whatever to the examiner or to the court by the use of such expression. It may be that he ought not to have used it, and he is sorry that he did so in the presence and hearing of the said Mrs. D., and in the hearing of the examiner.

"Respondent supposes the examiner left the office of P. & P. at the time he states. What caused him to leave, respondent does not know. He had no further business there to detain him, and respondent supposes he was on the act of leaving anyhow. The examiner, after a time, did return to the said office, at the request of Col F., who had returned to the door of the office, and said F. and respondent were conversing on the subject of taking the deposition of another witness. Said F. and respondent desired to do so, and at the request of said F. the examiner returned, as already stated. He was politely requested to take the said deposition both by respondent and said F., but refused in an abrupt and angry manner, stating that he would not do so, and respondent felt stung and angry at his manner, believing that he meant to snub and offend respondent, and thereupon respondent grew angry and did say that he could go to hell. He meant, however, no disrespect to the examiner as an examiner of the court; but to the man who, requested politely to take a deposition, on the sidewalk in front of the office of P. & P. refused in a way intended, as respondent thought, to cut and wound him, he did make a reply which but for his anger he would not have made, and which he regrets. But he denies that in such answer thus made there was any contempt of court, or violation of any of the statutes of the United States. It was a hasty and passionate expression, not used in the presence of the court or of its examiner when the examiner was engaged in any duty imposed on him by the court. It is true that respondent was excited, and that he may have used the remark attributed to him in reference to said E., and may have had his knife in his hand at the time. But he did not mean to do what he said. He spoke from passing anger and passion, and said E. was not present and did not hear what was said. This did not occur in the presence of the court or of the examiner when in the discharge of his duties, but upon the sidewalk in Memphis, and was plainly not intended as contempt of court or a violation of any statute of the United States. Respondent solemnly avers that he had no purpose whatever to offer disrespect or contempt to the court or its examiner as the officer of the court in this matter; and having fully answered he prays to be dismissed," etc.

*John B. Clough,* Asst. Dist. Atty., for the United States.

*George Gantt,* for defendant.

HAMMOND, J. The claim of respondent that his answer shall be treated as conclusively true cannot be admitted. Procedure in matters of contempt differs in courts of law and equity; and again in the latter according to the character of the alleged contempt. There are two classes of contempts in a court of equity, known as *ordinary* and *extraordinary,* though in modern times they have been called, as by Lord Chancellor BROUGHAM in *Wellesley's Case,* 2 Russ. & M. 639, *civil* and *criminal;* as to which he says: "I agree that there may oftentimes be a difficulty in finding—*First,* authority for deciding where the line is to be drawn; and, *secondly,* instances in practice for drawing it." He then shows how the distinction has been applied in courts of law, from which indeed he takes the nomenclature, while that of the equity courts much the better expresses the distinction as it there prevails. It would be interesting, if profitable in this case, to trace the influence of this distinction between *civil* and *criminal* contempts (which Mr. Beames, in arguing that case, denied) in breeding from mere implication that interminable confusion which is found in the law of contempts.

In a court of law, because that court abhors any method of trial of issues of fact except by a jury, if the party denied his contempt on oath, he was released, and the parties were left to seek redress through indictment or action, where the facts could be tried according to the course of the common law. Blackstone thinks this was in favor of liberty, as it was, and therefore excuses the anomaly of trying a man on his own oath. 4 Bl. Comm. 287. Except, however, in determining whether a member of parliament should or should not be imprisoned for his contempt, this distinction between civil and criminal contempts, or ordinary and extraordinary contempts, was wholly immaterial. As to ordinary mortals, in a court of equity, the distinction was one wholly of procedure.

In ordinary or civil contempts there was only a controversy between the parties, not involving the element of offense to the court, or rather to the king, in the fact of disobedience; though, *technically* and *in form,* that element was the *gravamen* of all processes of contempt. In extraordinary contempts the existence in fact of disrespect of authority was punished as an offense. The one was merely remedial, the other punitive or disciplinary. That which was remedial was less summary in its operation, in the sense that it took longer to accomplish the remedial purpose, and the matter had to progress by certain stages; as attachment, attachment with proclamations, commission of rebellion, sergeant at arms, sequestration, *habeas corpus,* and, finally, *pro confesso.* But every one of these processes for arrest was issued without notice to the defaulting defendant upon whom *subpœna* had been served. The contempt was cleared, not by answer to interrogatories, but by doing the thing commanded, and

until that was done the contemnor was imprisoned on any of the processes which caught him. If, after decree, the proceeding was to compel obedience, he had a new notice by writ of "execution of decree," which must precede the other steps mentioned above. As to these contempts the books of practice treat with great fulness. 1 Newland, Ch. Pr. 67–98, 233, 380, 384, 388; 1 Daniell, Ch. Pr. (1st Ed. vol. 3, McKinley & Lescure's Law Library,) 572–700; Id. (5th Ed.) 488, 1045, 1063. Where a defendant in custody under any of these processes of contempt desired to contest the regularity of his imprisonment, he applied by motion or petition, supported by affidavits, to discharge him, to which the plaintiff could file affidavits in answer, and the court would decide the matter upon these affidavits, or, if in doubt, refer it to a master. 1 Daniell, Ch. Pr. 665, (1st Ed., supra.[1])

Having called attention to the division of ordinary contempts into such as are committed by non-obedience to the *subpœna* and such as are committed by a non-obedience to a decree or order, Mr. Daniell, in the first edition, tells us that "there is another species of contempt in which the dignity of the court is chiefly concerned, and which cannot be purged by mere satisfaction to the party, but may be the subject of punishment by the infliction of imprisonment or fine. These are called *extraordinary* contempts, and are the subject of peculiar modes of proceeding which will be pointed out in another part of this treatise." 1 Daniell, Ch. Pr. 572. Our author did not redeem this promise, for I cannot find that he returns to the subject to inform us about these peculiar modes of proceeding. But Mr. Newland, another author of repute, displays the practice with sufficient detail to determine the question we have in hand. Having told us that to beat the person serving any of these ordinary processes of contempt, or to use contumelious expressions against the court or its process, was a contempt, and that what he had said concerning the *subpœna* in that regard applies to all other process, orders, and decrees, he further observes that "the usual mode of proceeding against persons guilty of those and other contempts, not falling within the description of ordinary contempts, is by applying to the court that they may be committed upon affidavit and notice of the application. However, in some cases of contempts, as when they consist of contumelious words against the court or its process, and are proved by only one witness, the practice seems to be, not to commit the party in the first instance, but to grant an attachment against him, in order that he might be

[1] NOTE. This edition is cited because it is nearest to the time when our federal equity rules were promulgated, and therefore the most reliable exponent of that practice to which we are bound by Equity Rule 90; Jones, Rules, 149; *Badger* v. *Badger*, 1 Cliff. 243. All subsequent editions, including the first American, are oftentimes misleading, because they are based on the second London edition, which was almost wholly rewritten in 1846, after Mr. Daniell's death, by Mr. T. E. Headlam, to conform the work to the very radical changes in English practice made after our equity rules were adopted.

brought in to be examined touching the contempt. In these cases, after the party is brought in, or appeared *gratis*, the prosecutor, upon notice thereof, files interrogatories for his examination.   *   *   *   If the party prosecuted for contempt denies it on his examination, or it does not clearly appear by his examination, the prosecutor may, if necessary, take out a commission of course to prove the contempt. The party prosecuted may cross-examine witnesses, and with leave of the court examine witnesses of his own. After these proceedings the court will decide whether a contempt has been committed or not, or will sometimes refer it to a master to certify whether the contempt be confessed or proved, or not." 1 Newl. Ch. Pr. 67, 392.

It is not always easy, however, to determine in practice to which of these classes a particular case may fall, and hence the practice is not uniform. Strictly, a court of equity, in a proceeding of the latter character, to which any misbehavior of the parties, attorneys, witnesses, jurors, or officers of the court, calculated to obstruct the efficient and orderly administration of justice in the given case, belongs, on its own motion, or that of the parties, proceeds to investigate *ex parte* the alleged contempt, and being satisfied thereof directs that the guilty person stand committed, unless he shall on a day assigned show cause to the contrary. This order *nisi* being served, if no answer be made the rule is made absolute, and the accused is then arrested and imprisoned according to its terms. If the accused appears, he is heard in any way that suits the convenience of the court, by an examination *ore tenus*, upon affidavits, or by propounding interrogatories. If he deny the contempt, the court, either for itself or by reference to a master, ascertains the facts upon the proof, either party examining witnesses by affidavit or otherwise. But there was never in a court of equity, as at law, any rule that the answer of the respondent to interrogatories should be taken as true and he discharged, if he denied the contempt. 1 Newl. Ch. Pr., *supra*; 1 Daniell, Ch. Pr. *supra*; Id. (5th Ed.) 1070, 1079, 1686; 5 Crim. Law Mag. p. 483, §§ 7–14, p. 508, §§ 27–30, p. 507, § 26, p. 513, §§ 32–37; 4 Bl. Comm. 288; 20 Amer. Law Reg. 147; 1 Bac. Abr. (Bouv. Ed.) 462; 2 Bac. Abr. (Bouv. Ed.) 633; *King* v. *Vaughan*, 2 Doug. 516; *Underwood's Case*, 2 Humph. 45; *Rutherford* v. *Metcalf*, 5 Hayw. 58; *McCredie* v. *Senior*, 4 Paige, 378; *Jackson* v. *Smith*, 5 Johns. 115; *Magennis* v. *Parkhurst*, 3 Green. Ch. (N. J.) 433; *Thornton* v. *Davis*, 4 Cranch, C. C. 500; *Parkhurst* v. *Kinsman*, 2 Blatchf. 76; *Whipple* v. *Hutchinson*, 4 Blatchf. 190; *Birdsell* v. *Manuf'g Co.* 1 Hughes, 59; *Worcester* v. *Truman*, 1 McLean, 483; *Gray* v. *Railroad*, Woolw. 63; *Fanshawe* v. *Tracy*, 4 Biss. 490; *Angerstein* v. *Hunt*, 6 Ves. 489; *Crook* v. *People*, 16 Ill. 534; *Buck* v. *Buck*, 60 Ill. 105.

But this method of procedure has, in modern practice, and since our federal equity rules were promulgated, fallen somewhat into desuetude, and has been superseded by substituting for an order of commitment *nisi* a rule to show cause why the party should not be

committed. This rule to show cause why an attachment should not issue, or an order of commitment be made, was a familiar one to both courts of law and equity, and was used where the evidence was not before the court as a mode of preliminary inquiry to determine whether any proceedings in contempt should be taken. It was, however, very conveniently converted into a procedure for determining the whole matter on its merits, and the court having the party before it proceeded, without technical practice, to try the entire question on this preliminary inquiry. Hence the answer of the respondent to such a rule in a court of law came to have the same effect as his answer to interrogatories in more regular practice. But no more in this modern practice than in that which is more technical can the respondent's answer be given that effect in a court of equity. 5 Crim. Law Mag. p. 494, §§ 8-12, 26; *In re Chadwick*, 1 Low. 439; *Hollingsworth* v. *Duane*, 1 Wall. C. C. 77, 102; *U. S.* v. *Wayne*, Id. 134; *Voss* v. *Luke*, 1 Cranch, C. C. 331; *U. S.* v. *Green*, 3 Mason, 482; *Thornton* v. *Davis*, 4 Cranch, C. C. 500; *U. S.* v. *Bollman*, 1 Cranch, C. C. 373; *Pitt* v. *Davison*, 37 N. Y. 235; 1 Tidd, Pr. 478-487. A few cases may be found so holding, but they are aberrations from the general line of authority and have not been approved. *Murdock's Case*, 1 Bland, Ch. 486, which cites *Childrens* v. *Saxby*, 1 Vern. 207, a case directly the other way; *Wells* v. *Com.* 21 Grat. 500, disapproved in *State* v. *Harper's Ferry Co.* 16 W. Va. 873. The cases cited by the respondent's counsel were all cases at law. *In re Edward S. May*, 1 FED. REP. 737; S. C. 2 Flippin, 562; *Re Pitman*, 1 Curt. 186; *U. S.* v. *Dodge*, 2 Gall. 313.

The next contention of the respondent is that our act of congress of March 2, 1831, c. 99, (4 St. at Large, 487; Rev. St. § 725,) has deprived the court of the power to punish for such contempts as that alleged against him. It is generally understood that the object of that statute, which has been substantially enacted in Tennessee (Code, § 4106) and other states was to enlarge the liberty of criticism by the press and others by curtailing the power to punish adverse comments upon the courts, their officers, and proceedings, as contempts which tend to impair respect for the tribunal, and thereby obstruct the administration of justice. *Ex parte Bradley*, 7 Wall. 364; *Ex parte Robinson*, 19 Wall. 505; *Re Chiles*, 22 Wall. 157; *U. S.* v. *Holmes*, 1 Wall. Jr. 1; *State* v. *Galloway*, 5 Cold. 326; *Harwell* v. *State*, 10 Lea, 544; *Poulson's Case*, quoted 1 Kent, Comm. 301; 5 Crim. Law Mag. p. 177, § 25; *Stuart* v. *People*, 4 Ill. 395; *Ex parte Hickey*, 4 Smedes & M. 750; *Gandy* v. *State*, 13 Neb. 445; S. C. 14 N. W. Rep. 155; *Ex parte Edwards*, 11 Fla. 174; *Williamson's Case*, 26 Pa. St. 21; *State* v. *Dunham*, 6 Iowa, 245; *People* v. *Wilson*, 64 Ill. 195.

I do not find it necessary to go into the distinctions between direct and constructive contempts, which are so unsatisfactory to all who study this subject. There is always a struggle to relegate every contempt to the odious category of constructive contempts, in order to

take shelter under these restrictive statutes. But I may say that, in my judgment, the courts will find that the legislature has not taken away any valuable power, when these statutes are properly understood. Notwithstanding the seemingly formidable array of authority, it may be that, after all, it is a mistake to say that all contempts not committed in the presence of the court are constructive only. The mere place of the occurrence may not be an absolute test of that question, and it may depend on the character of the particular conduct in other respects besides the place where it happens. To print hostile comments on the court, its officers, or proceedings, as in cases where the question generally arises, or to ride one's horse into the tavern where the judge sleeps, as in *Com.* v. *Stuart*, 2 Va. Cas. 320, may be only constructively a contempt, as it very indirectly obstructs the course of justice, if at all; but where it takes the form of an assault upon an officer, as when he was beaten and made to eat the process and its seal, in *Williams* v. *Johns*, 2 Dick. 477, S. C. 1 Mer. 302, note *d*, the impediment to the efficient administration of justice may be quite as direct in its operation to that end, happen where it may, as if the party had ridden his horse to the bar of the court and dragged the judge from the bench to beat him. *Com.* v. *Dandridge*, 2 Va. Cas. 408; *People* v. *Wilson*, 64 Ill. 195. Be this as it may, wherever the conduct complained of ceases to be general in its effect, and invades the domain of the court to become specific in its injury, by intimidating, or attempting to intimidate, with threats or otherwise, the court or its officers, the parties or their counsel, the witnesses, jurors, and the like, while in the discharge of their duties as such, if it be constructive because of the place where it happens, because of the direct injury it does in obstructing the workings of the organization for the administration of justice in that particular case, the power to punish it has not yet been taken away by any statute, however broad its terms may apparently be.

Lord ELDON was asked to commit a solicitor's clerk for breaking open the desk of another clerk, in the office of the register of the court. He said: "These officers are a part of the court itself; and if the register does not come forward the clerk has a right to protection in his own behalf." *Ex parte Burrows*, 8 Ves. 535. A messenger in bankruptcy was protected while on shipboard in charge of the goods. *Ex parte Dixon*, 8 Ves. 104. It is a contempt to insult a suitor and his solicitor while attending in the master's office, and the party will be attached at once on production of the master's certificate. *French* v. *French*, 1 Hogan, 138; *Ex parte Ledwick*, 8 Ves. 598; *Ex parte King*, 7 Ves. 312. A party was committed for terrifying a witness about to be examined at a commission. *Partridge* v. *Partridge*, Toth. 40. In Pennsylvania an examiner himself has power to punish a witness for contempt in refusing to obey his order, because it is a contempt of the process and not of the officer, (*Com.* v. *Newton*, 1 Grant, Cas. 453;) and in New York the refusal of a witness to answer

the grand jury is a contempt "in the presence of the court." *People* v. *Hackley*, 24 N. Y. 74. Any contempt against commissioners deriving their authority from the great seal is punishable by the great seal. *Com.* v. *Hicks*, 1 Dick. 61. Commitment without rule *nisi* for an assault upon the messenger of the great seal while in discharge of his duty which was a contempt. This shows it was on the same footing as a contempt in the face of the court. *Elliot* v. *Halmarack*, 1 Mer. 301; *Ex parte Clarke*, 1 Russ. & M. 563. A party attending before an arbiter substituted for the master is entitled to protection. *Moore* v. *Aylet*, 2 Dick. 780. A peer, ordinarily privileged, for abducting a ward of the court was committed "for obstruction to the process of the king's court and contempt in the nature of obstruction to the king's court." *Wellesley's Case*, 2 Russ. & M. 639. A member of parliament was committed to the Fleet for sending a threatening letter to a master before whom he had a case pending, in which he was party, and counsel and the house of commons held he was not privileged. *Charlton's Case*, 2 Mylne & C. 316.

These cases show that such contempts are as aggravated as those directed at the court itself in open court, and, if there be two witnesses to the contempt, a rule *nisi* is unnecessary under the old practice. *Anon.* 3 Atk. 219. The contempt occasioned by the misbehavior of an officer of the court—and the same rule applies to the attorneys, parties, etc.—is not included in the prohibitions on the court of the act of congress of March 2, 1831. Rev. St. § 725; *Re Pitman*, 1 Curt. 186. It is a contempt to make a riot on a railroad, by strikers, while the road is in the hands of a receiver of the court. *Secor* v. *Railroad Co.* 7 Biss. 513; *King* v. *Railroad Co.* Id. 529. To curse a witness in the piazza of the court-house is a contempt "in the presence of the court," (*U. S.* v. *Carter*, 3 Cranch, C. C. 423;) and this notwithstanding the act of 1831. *U. S.* v. *Emerson*, 4 Cranch, C. C. 188. Here one was called a liar in the hearing of the crier and other officers of the court. It is a contempt for persons to leave the room "contrary to the express command of the bailiff." *Offutt* v. *Parrott*, 1 Cranch, C. C. 154. It is "an obstruction of justice" for a juror to form and express an opinion after service, in order to disqualify himself. *U. S.* v. *Devaughan*, 3 Cranch, C. C. 84. A witness before a grand jury refused to answer, and "behaved in an insolent manner and threatened some of the jurors;" held a contempt. *U. S.* v. *Caton*, 1 Cranch, C. C. 150. A contempt of a register in bankruptcy is a contempt of the court itself. *Re Allen*, 13 Blatchf. 271; *Re Speyer*, 6 N. B. R. 255. And so it is a contempt for a party to refuse to obey a referee's order to allow a witness to see books produced upon an order of the court; and a statute authorizing referees to punish for contempt does not deprive the court of its concurrent power over such contempts. *Sudlow* v. *Knox*, 4 Abb. App. Dec. 326; *Re Seeley*, 6 Abb. Pr. 217; 5 Crim. Law Mag. p. 159, §§ 7, 27.

The privilege of protection to all engaged in and about the business of the court from all manner of obstruction to that business, from violence, insult, threats, and disturbance of every character, is a very high one, and extends to protect the persons engaged from arrests in civil suits, from service of process, etc. It "arises out of the authority and dignity of the court," and may be enforced by a writ of protection, as well as by punishing the offender for contempt. A master, examiner, referee, or commissioner acts under the authority of the court when he makes a lawful order, and the order need not be a written one. *Bridges* v. *Sheldon*, 7 FED. REP. 17, 42, 45. Attorneys are officers of the court, and are, like parties, witnesses, jurors, and the officials, entitled to protection, and are subject especially to the power of the court to compel them to behave themselves with propriety in such matters as pertain to the business of the court in all its ramifications. *Ex parte Garland*, 4 Wall. 378; *Ex parte Bradley*, 7 Wall. 374; *Ex parte Paschal*, 10 Wall. 491; *Ex parte Wall*, 107 U. S. 265; S. C. 2 Sup. Ct. Rep. 569; *Re Woolley*, 11 Bush, 95; *Ex parte Cole*, 1 McCrary, 405; 5 Crim. Law Mag. p. 186, §§ 30, 31; Weeks, Attys. 180–188; Weeks, Dep. p. 143, § 120.

A witness cannot refuse to answer the examiner because the question is irrelevant or improper, his remedy being by a demurrer to the interrogatory to take the opinion of the court. 5 Crim. Law Mag. p. 185, § 29, and notes; 1 Daniell, Ch. Pr. (5th Ed.) 942; *Re Judson*, 3 Blatchf. 148. But the contempt may be excused if the witness honestly acts under the advice of counsel. *Roberts* v. *Walley*, 14 FED. REP. 167. But it is contempt for counsel to advise a witness not to answer, and a more serious contempt to prompt a witness in his answers. *Re Eldridge*, 82 N. Y. 161; *Heerdt* v. *Wetmore*, 2 Rob. (N. Y.) 697; *Com.* v. *Feely*, 2 Va. Cas. 1.

These authorities show most conclusively that whatever may be the restrictions imposed by our statute, they certainly have no application to a case like this, involving the conduct of a party to the suit, who is at the same time an attorney in the case, towards an officer of the court, in a proceeding before him had in the case itself. Indeed, it falls within the permissive language of the statute. If the "misbehavior" was not "in the presence" of the court, or "so near thereto as to obstruct the administration of justice," it was "the disobedience or resistance" by "an officer," and "a party" to "a lawful order, decree, or command" of the court. Rev. St. § 725. The order of the court was that the proof should be taken before this examiner, and respondent's conduct was well calculated to, and did, in fact, "obstruct the administration of justice" by impeding the examination of a witness. Nor is the case any better for respondent on his own showing, ingeniously contrived as the answer is to evade the force of the facts as they are admitted to be. Neither the report of the examiner and the affidavits, nor the answer of the defendant, describe with sufficient precision the acts of the respondent; but it suf-

ficiently appears from the language admitted to have been used, and the conduct of the persons engaged about the business, in leaving the disgraceful scene, to have been of that violent character which justified the examiner, the associate and opposing counsel in their protests against it. It was impossible to proceed with the business unless by submission to respondent's violent and imperious will. This is wholly inconsistent with the avowed error of judgment and absence of intentional disrespect for the authority of the court. It is thoroughly well settled that the avowal of such respect cannot weigh against the plain implications of the conduct itself. *Re May, supra; Wartman* v. *Wartman,* Tan. Dec: 362, 370; *People* v. *Freer,* 1 Caine, 485, 518; 5 Crim. Law Mag. p. 510, § 29. Counsel and parties have ample opportunity, by interrogatories and counter interrogatories, to have a witness explain his answers, or the witness may, as we have seen, seek the protection of the court by demurrer; but all testimony would be of little value if counsel or parties be permitted to dictate, prompt, or otherwise control the answers; and it is, as we have seen, a contempt to do this, even where there is no exhibition of violence and contemptuous conduct, as in this case.

Again, while the language used about the opposing counsel was not, in his absence, a contempt, although the attorneys are as much under the protection of the court from violence, insults, and threats as any other official, the conduct of the respondent towards the examiner was a gross contempt of this court, and it can have no toleration for the distinction assumed by counsel between the man and the officer. No such distinction exists in the law, as shown by perhaps the ablest case on the law of contempts to be found in the books. *Com.* v. *Dandridge,* 2 Va. Cas. 408; *Fitler* v. *Probasco,* 2 Brown, (Pa.) 137. Besides, the respondent does not aver any other cause of complaint against this officer than such as he had growing out of their official relations to the transactions of this case. If respondent had shown facts *aliunde* that relation to provoke, however unnecessarily, his violent language, there could have been no contempt of this court, of course. But in their official relations to the case both are under the protection and privilege of the court, while engaged, as they then were, about the business of the court, from all contumely, insult, and violence towards each other. Altogether, the proof shows, on the part of the respondent, a reckless disregard of the ordinary proprieties of the occasion, and of the authority of the court, too serious to be overlooked by the most indulgent court.

In all cases of the kind the courts are troubled about the penalty to be imposed for the contempt. Ordinarily, courts of equity meet such defiance of their authority by imprisonment, which the conduct of respondent richly merits. But the court has observed in the progress of this case that the respondent is not a man of cool head or cool temper. Unfortunately, he has undertaken the always doubtful task of representing himself as counsel in an acrimonious litiga-

tion, in which, in every possible sense, he is deeply interested as party, witness, guardian, etc. Naturally, his feelings are intensely involved, and in all litigation of this kind, certainly in this, much occurs calculated to exasperate the feelings of a man of the temperament described. That any such cause existed on this occasion does not appear; but, yielding to this consideration of the infirmities of human nature, the court has determined to impose only a fine. The judgment of the court, therefore, is that the defendant be adjudged guilty of contempt, and that he pay a fine of $50 and the costs of this proceeding, and that he stand committed until the fine and costs are paid.

Decree accordingly.