In re INDEPENDENT PUB. CO. et al.

INDEPENDENT PUB. CO. et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. February 13, 1917.) ·

No. 2740.

1. CONTEMPT ⬅6—ACTS COMMITTED IN PRESENCE OF COURT—FEDERAL STAT-
UTE.
Under the provision of Judicial Code, § 268 (Act March 3, 1911, c. 231,
36 Stat. 1163 [Comp. St. 1913, § 1245]), that the power of the federal
courts to punish contempts "shall not be construed to extend to any cases
except the misbehavior of any person in their presence or so near thereto
as to obstruct the administration of justice," the physical nearness to
the place where the court is in session of the actual commission of the
act charged as a contempt is not important, but, as in the law of con-
structive presence in criminal cases, the misbehavior is committed where
it takes effect.
[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 6, 9, 10, 13.]

2. CONTEMPT ⬅9—ACTS CONSTITUTING—NEWSPAPER PUBLICATIONS.
The public press is not immune from the provisions of such statute
authorizing punishment for contempts, but the freedom of the press
guaranteed by the Constitution is subordinate to the independence of the
judiciary and a newspaper article tending to interfere with the orderly
procedure of the courts or to obstruct the administration of justice in
accordance with legal standards is a contempt which is committed wher-
ever the newspaper is intended to and does in fact circulate.
[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 8, 15–18.]

3. CONTEMPT ⬅3—ACTS CONSTITUTING—NEWSPAPER PUBLICATION.
Respondents, the publisher and managing editor of a newspaper, pub-
lished in a city where a federal court was in session, and circulated ex-
tensively in the city and throughout the state, permitted to be published
therein an article containing statements relating to the defendant in a
criminal case then on trial, such as that he was a paroled convict from
the penitentiary of another state, was said to have committed other
crimes described and other statements, not based on any evidence in the
case nor admissible therein, but which were extremely prejudicial to the
defendant. The article was read by some of the jurors in the case, and
made it necessary to discharge the jury and continue the case. *Held,*
that the court was within its power in imposing a fine for contempt on
the publisher of the paper and also on the managing editor, although
he did not personally see the article before its publication, on the
ground that he failed in his duty to exercise proper editorial supervision.
[Ed. Note.—For other cases, see Contempt, Cent. Dig. § 4.]

4. CONTEMPT ⬅66(1)—PROCEEDINGS FOR PUNISHMENT—REVIEW ON ERROR.
The decision of the trial tribunal on the facts in a proceeding for con-
tempt is not reviewable on a writ of error.
[Ed. Note.—For other cases, see Contempt, Cent. Dig. § 214.]

5. CONTEMPT ⬅72—PUNISHMENT OF CRIMINAL CONTEMPT—DISCRETION IN
FIXING FINE.
It is within the discretion of the court, in imposing a fine for a crimi-
nal contempt which made it necessary to discharge the jury and grant a
continuance in a criminal case then on trial, to take into consideration the
increased costs thus incurred by the government.
[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 249–256, 273.]

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
240 F.—54

In Error to the District Court of the United States for the District of Montana; Geo. M. Bourquin, Judge.

Proceeding for criminal contempt against the Independent Publishing Company and Will A. Campbell. From the judgment respondents bring error. Affirmed.

For opinion below, see 228 Fed. 787.

Information charging the Independent Publishing Company and Will A. Campbell, its managing editor, with misbehavior in obstructing the administration of justice in publishing matter concerning and prejudicial to the defendant then on trial. From a judgment holding respondents to be guilty of contempt of court, as alleged in the information, and imposing a fine therefor, respondents bring this writ of error.

During a special term of the United States District Court for the District of Montana, held in the city of Helena, in November, 1915, an information under oath was filed in the court by the United States District Attorney for the District of Montana, from which it appeared that on November 26, 1915, there came on for trial the issue joined upon an indictment then pending in that court against one William T. Poe, charging the defendant with having wrongfully, unlawfully, and feloniously devised an artifice or scheme to defraud certain parties named, and, in furtherance of said scheme, had used the United States mails by placing, or causing to be placed, in the post office of the United States at Harlem, Mont., a letter, contrary to the statute in such case made and provided. A jury was impaneled to try the case, and, when the time for the adjournment of the court for the day had arrived, the cause was still pending, undetermined. The court thereupon duly admonished the jury as to its conduct during the adjournment, and adjourned the court and the trial of the cause until 10 o'clock in the forenoon of the following day; the jury separating and going to their respective places of abode in the city of Helena.

There was at that time published in the city of Helena a daily newspaper, named The Helena Independent, published by the Independent Publishing Company, a corporation, with Will A. Campbell as its manager and editor. This paper was the only morning newspaper published in Helena, and it had a large circulation in that place and elsewhere. On the morning following the adjournment of the court mentioned above, the Independent contained the following article, to wit:

" 'Slick' Mr. Poe is Now on Trial.

"Former Auditor of North Dakota City, Ex-Convict,
"Charged with Fraud.

"Was Sentenced to 32 Years for Embezzlement in North Dakota and Gets in Trouble Shortly After He is Paroled from Prison.

"W. T. Poe, former city auditor of Williston, North Dakota, ex-convict, homesteader and alleged forger, was placed on trial in the federal court yesterday to answer an indictment charging him with using the mails to defraud. The government got under headway with its presentation of the evidence against the defendant yesterday afternoon and the case is expected to go to the jury some time today.

"Poe is charged with using the United States mails to defraud E. C. Carney and company of Williston, North Dakota. It is alleged in the indictment that Poe, under the alias of J. C. Cross, secured a loan from Carney and company of $300, giving a mortgage on the farm of Alf Larson. Poe, it is alleged, forged the name of Larson to the checks sent him by the Carney Company.

"Juggled City Funds.

"Poe was city auditor of Williston, North Dakota, for nearly four years. A little more than two years ago he was caught in a number of forgeries and embezzlements, it is said, and was sentenced to an aggregate of 32 years in

the penitentiary of North Dakota. His sentences would have been in part concurrent and would have given him a total of 12 years in prison. One embezzlement of which Poe was convicted was the raising of a $1.50 check to $1,500. North Dakota officials who are here to testify for the government say that Poe destroyed many of the records of his office before his peculations were uncovered.

"After Poe had been in the North Dakota penitentiary for two years he was given a parole after his wife had worked incessantly in his behalf. His wife had previously come to Montana and taken up a homestead and he was allowed to leave North Dakota under his conditional pardon on condition that he was to come to the Montana homestead and live a quiet life with his wife.

### "Other Alleged Wrongs.

"Other alleged shady acts on the part of Poe are now under investigation in the eastern part of the state, say the officials. It is also stated that Poe, who is a young man, comes of good people in North Carolina, but escaped prosecution in his native state on his promise to leave North Carolina and remain away for good.

"In the present trial Poe is being defended by Attorney W. W. Patterson. United States Attorney B. K. Wheeler and Deputy Attorney Homer G. Murphy are prosecuting the case.

"The jurors are John Pearson, H. M. Ogden, F. H. Dean, George W. Hart, W. S. Marshall, Frank A. Fellows, John Dorfler, E. L. Fiske, W. H. Ogle, V. L. Hagman, R. G. Dixon and W. D. Nield."

The information charged that this article was not based upon the facts introduced in evidence on the trial of the case, but was written and published for the purpose of giving to the public generally, and to all persons who should read said newspaper and the said article, certain facts relating to the past life of the defendant, and to inform the jury, and the members thereof who might read the newspaper and the article, of certain facts concerning the defendant which were highly prejudicial to his character and reputation, and would, when read by the jury, or any members thereof, tend to bias and prejudice them against the defendant and prevent the jury, and the members thereof who had read the article, from giving the defendant a fair and impartial trial, for the reason that it brought to their attention certain facts concerning the life of the defendant which were not material to the issues of the cause and could not be proven on the trial of the cause against the defendant unless on the trial of the cause he had taken the witness stand in his own behalf, or placed his good character in issue.

When the court convened on the following day pursuant to the adjournment, it appeared to the court that certain members of the jury had read the article so written and published, and by reason thereof had been informed and advised of the alleged facts so published about the defendant and his life and reputation, and it further appeared to the court that the defendant, by reason of the facts stated, could not have a fair and impartial trial by the jury; and, by reason thereof, the court, upon the request and consent of the defendant, was compelled to discharge the jury from a further consideration of the cause, continue the trial thereof, and remand the defendant to the custody of the United States marshal until the case could thereafter be tried.

The court thereupon cited the Independent Publishing Company and Will A. Campbell, its manager and editor, to show cause why they should not be punished for contempt for publishing said article, which said article, it was charged, was calculated to excite prejudice against the said defendant and prevent him from having a fair and impartial trial, thus obstructing and interfering with the due administration of justice in the said court and the cause on trial. In response to this citation, the Independent Publishing Company and Will A. Campbell appeared and filed their answer to the information and citation, in which the ownership and management of the Independent newspaper and the publication of the article in question, as charged in the information, was admitted. It was admitted that Campbell was charged with the editorial supervision of the paper, and alleged that he exercised reason-

able care in the selection and employment of editors and reporters. It was also admitted that the article was not based on facts admitted in evidence at the trial. It was alleged that Campbell, as editor and manager, exercised reasonable care in excluding from the paper articles reflecting upon the courts or in any manner tending to interfere with the administration of justice. The answer recited the circumstances connected with the publication of the article, and it was alleged that it was prepared by W. H. Perkins, one of the reporters of the paper, *and published without editorial supervision;* that Perkins received the data for the article from a reliable source, and that he wrote and published the article in good faith, without intending to interfere with the administration of justice. It was also alleged that neither Campbell, nor any officer of the corporation, had any knowledge of the contents of the article until after publication. It was not denied that the publication of the article was an obstruction of and an interference with the due administration of justice, as charged in the information.

The matter was thereupon submitted to the court upon the information and answer, no evidence being introduced at the hearing, and thereupon the court recited the facts as stated in a written opinion (In re Independent Pub. Co. [D. C.] 228 Fed. 787), and found as a fact that the article in question was calculated to influence the jury and judge and prevent a fair and impartial trial, that the article was calculated to obstruct the due administration of justice, and that the misbehavior of the respondents was so near to the court as to obstruct the due administration of justice therein.

E. C. Day and Walsh, Nolan & Scallon, all of Helena, Mont., for plaintiffs in error.

Burton K. Wheeler, U. S. Atty., of Butte, Mont., Homer G. Murphy, of Helena, Mont., and Frank Woody, Asst. U. S. Attys., of Butte, Mont.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). It was admitted by the plaintiffs in error in their answer to the information charging them with contempt that the article in question was not based upon the evidence introduced upon the trial of the case; and it was not denied that the publication contained facts relating to the past life of the defendant, highly prejudicial to him, and when read by the jury tended to bias and prejudice them against the defendant and prevent them from giving him a fair and impartial trial; and it is not denied that the publication obstructed the progress of the cause on trial, and compelled the court to discharge the jury impaneled to try the case, resulting, as the court found as a fact, in the infliction of pecuniary damages to the government, in costs uselessly incurred, amounting to $617.95.

[1] 1. The contention of the plaintiffs in error is that the publication is not within the scope of the statute. Section 268 of the Judicial Code (section 725, R. S.; Act of March 2, 1831) provides:

"The said courts shall have power * * * to punish * * * contempts of their authority: Provided, that such power * * * shall not be construed to extend to any cases except the misbehavior of any person in their presence, *or so near thereto as to obstruct the administration of justice.* * * *" Comp. St. 1913, § 1245.

This statute had its origin in the act of March 2, 1831 (4 Stat. 487, c. 99, § 1), from which it differs only slightly in language, not in substance. The original Judiciary Act of September 24, 1789 (1 Stat. 83,

c. 20, § 17), provided that the "courts of the United States shall have power * * * to punish by fine or imprisonment, at the discretion of said courts, all contempts of authority in any cause or hearing before the same."

The interesting and able argument of counsel for plaintiffs in error traces the history of this statute through the impeachment proceedings of Judge Peck in 1830, and subsequent cases, to the conclusion that it does not apply to newspaper publications under any circumstances. The case of Ex parte Poulson (1835) Fed. Cas. No. 11,350, does undoubtedly support that view. The court was there dealing with a publication very similar in character to the publication in this case. Referring to the limitation provided in the act of March 2, 1831, Mr. Justice Baldwin said:

"The court is disarmed in relation to the press; it can neither protect itself, or its suitors; libels may be published upon either without stint; the merits of a cause depending for trial or judgment may be discussed at pleasure; anything may be said to jurors through the press, the most willful misrepresentations made of judicial proceedings, and any improper mode of influencing the decisions of causes by out of door influence practiced with impunity."

Referring to the circumstances under which the statute was enacted, the court said:

"It was enacted shortly after the acquittal of Judge Peck, of Missouri, on an impeachment preferred against him for issuing an attachment against a member of the bar for making a publication in relation to a suit which had been decided by that judge. On the trial the law of contempt was elaborately examined by the learned managers of the House of Representatives and the counsel for the judge. It was not controverted that all courts had power to attach any person who should make a publication concerning a cause during its pendency, and all admitted its illegality when done while the cause was actually on trial. It had too often been exercised to entertain the slightest doubt that the courts had power, both by the common law and the express terms of Judiciary Act, § 17 (1 Stat. 83), as declared by the Supreme Court, to protect their suitors by the process of attachment."

An examination of the proceedings in Congress against Judge Peck shows that the court correctly interpreted the character of the prosecution. The impeachment charges were pressed largely because of the fact that the publication containing the article criticizing the court was made after the judge had delivered his opinion, finished the case, adjourned the court and had descended from the bench; and for that reason it was contended that the publication was not in contempt of the authority of the court "in any cause or hearing before the same." Mr. Buchanan, then a member of the House, afterwards President of the United States, favored the impeachment of Judge Peck, and was one of the managers on behalf of the House in the proceedings. In the House and before the Senate, Mr. Buchanan was careful to explain that the publication held by Judge Peck to be a contempt of court was made after Judge Peck's judicial functions in the particular case had ceased, and that all the authorities, both in England and America, held that such publications were not contempt of court. But notwithstanding this feature of the case was clearly presented, Judge Peck was acquitted on January 31, 1831; the vote in the Senate being 21 for, and

22 against conviction. It is said that the acquittal resulted from a belief on the part of the senators that Judge Peck acted in good faith in exercising jurisdiction and in holding the publication in question a contempt. Constructive Contempt, by Thomas, page 171. Then followed a report of a bill from the judiciary committee of the House by Mr. Buchanan, its chairman, entitled "An act declaratory of the law concerning contempts of court," which passed both houses without debate and became the act of March 2, 1831. A fair and reasonable construction of this declaratory statute in the light of these proceedings is that Congress intended to so limit the power of the court to punish for contempt that the summary authority exercised by Judge Peck, in a case where *the judicial authority had ceased,* would thereafter be prohibited; but it was not intended to disarm the courts to such an extent that in a pending case they would not be able to protect themselves, the jurors in attendance, or suitors, from the misbehavior of others that would obstruct the administration of justice.

This we find to be the construction generally placed upon the statute by the federal courts and by state courts where similar statutes have been construed. It was held by the Supreme Court of the United States in Ex parte Robinson, 86 U. S. (19 Wall.) 505, 510, 22 L. Ed. 205, that the act of March 2, 1831, limited the power of the circuit and district courts to inflict summary punishment to certain specified cases, among others (following the words of the statute), "where there has been misbehavior of a person in the presence of the courts, *or so near thereto as to obstruct the administration of justice."* It is true the court says, further:

"As thus seen, the power of these courts in the punishments of contempts can only be exercised *to insure order and decorum in their presence,* to secure faithfulness on the part of their officers in their official transactions, and to enforce obedience to their lawful orders, judgments, and processes."

But the question we are now considering was not before the court. Robinson sought to be relieved from an order of the district court in Arkansas, disbarring him for an alleged contempt in its presence. The Supreme Court held that the district court in this particular case had no authority to enter a summary order of disbarment as a punishment for contempt; that before a judgment disbarring an attorney is rendered, he should have notice of the grounds of complaint against him and ample opportunity of explanation and defense. This opportunity Robinson had not had, and the contempt proceedings were accordingly reversed. The opinion in this case was written by Mr. Justice Field, and it is clear that the general expression concerning "order and decorum in their presence" was not intended as a construction that the statute was so limited, and the words, "so near thereto as to obstruct the administration of justice," were to be ignored.

In Sharon v. Hill (C. C.) 24 Fed. 726, Mr. Justice Field, sitting with Judge Sawyer, had under consideration the conduct of the defendant, Sarah Althea Hill, in that case, who drew a pistol and threatened the life of counsel during the examination of a witness before the examiner in chancery. The matter being reported to the court by the examiner, Judge Sawyer, speaking for the court, said:

"It is unquestionably a contempt. It is a contempt committed before an officer lawfully taking testimony in this case, the proceeding being a part of the trial of the case, in the chambers of the judge adjoining the courtroom; the examiner being an adjunct of the court—a part of the court itself. This act reported is undoubtedly as distinctly and clearly a contempt of court as though committed in the presence of the judge, in the courtroom, while in the act of trying a case, either with or without a jury. This point is well discussed by Judge Hammond, of the District of Tennessee, in U. S. v. Anonymous, a case of much milder type of contempt [C. C.] 21 Fed. 761."

Referring to the case here cited with approval, we find that Judge Hammond says ([C. C.] 21 Fed. 761):

"The courts will find that the Legislature has not taken away any valuable power, when these statutes are properly understood. * * * The mere place of the occurrence may not be an absolute test of that question, and it may depend on the character of the particular conduct in other respects besides the place where it happens. * * * Wherever the conduct * * * ceases to be general in its effect, and invades the domain of the court to become specific in its injury, by intimidating, or attempting to intimidate, with threats or otherwise, the court or its officers * * * while in the discharge of their duties as such, if it be constructive because of the place where it happens, because of the direct injury it does in obstructing the workings of the organization for the administration of justice in that particular case, the power to punish it has not yet been taken away by any statute, however broad its terms may apparently be."

But a summary judgment of contempt was not entered against the defendant in Sharon v. Hill, supra, the court waiving that proceeding and calling the attention of the United States Attorney to the defendant's conduct as a breach of certain statutes of the United States mentioned in the opinion of the court. No action was, however, taken by the United States Attorney, possibly for the reason that orderly behavior by the defendant was expected without such harsh proceedings. The expectation was not realized. The case as it progressed was attended by the conduct of another in her interest of the most contemptuous and flagrant character, and finally resulted in the killing of Judge Terry by the deputy United States marshal at Lathrop, Cal., on the 14th day of August, 1889; the deputy marshal having been detailed by the Department of Justice to guard Mr. Justice Field from assault by parties to the action. See Ex parte Terry, 128 U. S. 289, 9 Sup. Ct. 77, 32 L. Ed. 405; In re Neagle, 135 U. S. 1, 10 Sup. Ct. 658, 34 L. Ed. 55.

In the case of Savin, Petitioner (1889) 131 U. S. 267, 9 Sup. Ct. 699, 33 L. Ed. 150, the petitioner had been adjudged guilty of contempt of court in attempting to deter a witness in the District Court from testifying in a case pending therein, and to obstruct or impede the due administration of justice therein. The misbehavior consisted in the petitioner approaching a witness for the United States and endeavoring to deter him from testifying on behalf of the government and afterwards offering the witness money not to testify against the defendant in the action. Neither of these acts was in the actual presence of the court, and neither disturbed the court in its orderly decorum or proceedings. The first act of the petitioner was charged to have occurred in a room adjoining the courtroom, and the second in the hallway of the court building. The Supreme Court held that the conduct of the

petitioner in both acts was misbehavior in the presence of the court, for which he was sentenced to be punished for contempt.

In the case of Cuddy, Petitioner (1889) 131 U. S. 280, 9 Sup. Ct. 703, 33 L. Ed. 154, the petitioner had been adjudged guilty of contempt of court in approaching a trial juror, prior to his being drawn in a particular case, with a view of improperly influencing the juror in the event he should be sworn as a juror in the case. The difference between the Savin Case, cited above, and this case was that the misbehavior constituting the contempt in the Savin Case occurred in the court building and while the court was in session, whereas the misbehavior charged in this case did not occur in the court building nor, so far as the record disclosed, while the court was in session. The petitioner contended that under no view of the facts could his misbehavior be deemed to have occurred in the presence of the court or so near thereto as to obstruct the administration of justice. The Supreme Court held that the record disclosed a case of contempt, and, not showing it was beyond the jurisdiction of the court, it would be presumed that the evidence made a case within such jurisdiction, to be punished as and for a contempt.

Mr. Justice Field was a member of the Supreme Court in both of these cases, from which, and from the case of Sharon v. Hill, supra, we draw the conclusion that in the Robinson Case he did not intend to construe the statute as limiting the power of the court to punish for contempt to be exercised only for the purpose of insuring order and decorum in its presence.

In McCaully v. United States (1905) 25 App. D. C. 404, the charge was an attempt corruptly to influence a juryman in a pending case before the Supreme Court of the District of Columbia two days before the case was called for trial. It appeared that the appellant had called twice at the juryman's residence without seeing him. Thereupon the juryman called at the appellant's place of business, where the appellant stated to him that there was a man in trouble whom the railroad company was trying to down. The juryman refused to talk, as he was on the jury panel, and thereupon he left. The Court of Appeals states that the contention of the appellant was that the offense, if proven, was not a case of contempt, as it was not committed in the presence of the court or so near thereto as to obstruct the administration of justice, but at a distance from the court, the appellant's place of business being a half a mile or more away; that, the place of solicitation of the juryman being far removed from the courthouse, the statute expressly removed the act from the cognizance of the court as an act of contempt, and simply left it to be punished by the court as an ordinary criminal offense under another provision of the statute. The Court of Appeals held that:

"The question is not one of geography or topography, or propinquity or remoteness, but one of direct influence upon the administration of justice. The administration of justice is equally obstructed wherever the act is done; and the place of the solicitation is absolutely of no consequence whatever. Whether the act was done in the courthouse, or a mile or 100 miles away, the result is precisely the same; the disturbance to the court is precisely the same. The act in its nature is not one dependent upon location for its greater or less influence on the administration of justice. * * * But the bribery

of a juror or the intimidation of a witness pollutes the fountains of justice at their source, and reach at once to the very seat and shrine of the administration of justice, whatever be the place where the formal act is done. Under such circumstances the court is wherever the juror or the witness is; and there is no question of locality in the case. * * * Every juror is part of the court wherever he is. Under our common law the jury is as much a part of what may be designated as the machinery of the administration of justice as is the judge, and a corrupt attempt to influence the jury, or any individual member of it, is an offense differing only in degree from a similar attempt to corrupt the judge. Judge and jury are component parts of the court. An attempt upon the integrity of the jury, or upon the integrity of any individual juror, is a direct attack upon the court; and the court is entitled to protect itself from all such attacks by the methods which the common law has established for the purpose, namely, by the way of summary proceedings for contempt of court."

Petition to the Supreme Court of the United States for a writ of certiorari was denied in this case. 198 U. S. 586, 25 Sup. Ct. 803, 49 L. Ed. 1174.

The case of Kirk v. United States (1911) 192 Fed. 273, 277, 112 C. C. A. 531, 535, in this court, was also a case where jurors in attendance upon the trial court had been approached in the interest of one who had been indicted for a violation of the statutes of the United States and whose trial had been set for a future day. The attempt was to influence the jurors in favor of the accused, with the promise that they would be paid money if they should be in favor of the accused. The place where one of these jurors was approached was distant about nine blocks from the United States court building. These facts being proved, the trial court found the plaintiff in error guilty of contempt of court. It was contended on his behalf in this court that the acts charged were not committed "in the presence of the court, or so near thereto as to obstruct the administration of justice" within the meaning of the statute. Judge Gilbert, speaking for the court and replying to this contention, said:

"It is obvious that any willful attempt improperly to influence jurors in the impartial discharge of their duties in a pending case, whether by attempts to bribe or otherwise, no matter where it is committed, is sufficiently near to the presence of the court to tend to obstruct the administration of justice. It is not to be supposed that in enacting the statute Congress intended to deprive the federal courts of the power to deal summarily with persons who are attempting to corrupt jurors who have been called to decide pending cases, for without that power the courts would be practically helpless in the presence of an organized scheme, such as is shown by the evidence in this case, for the purpose of interfering with the administration of justice. There is every reason why the court should have the power to deal with such attempts at their very inception, so as to prevent the evil, and should not be confined to the remedy by indictment to punish such acts after the evil has been accomplished."

Like the law of constructive presence in criminal cases, the misbehavior is committed where it takes effect.

"The well-established theory of the law is that, where one puts in force an agency for the commission of crime, he, in legal contemplation, accompanies the same to the point where it become effectual. * * * So, if a man in the state of South Carolina criminally fires a ball into the state of Georgia, the law regards him as accompanying the ball, and as being represented by it up to the point where it strikes." Simpson v. State, 92 Ga. 41, 17 S. E. 984, 22 L. R. A. 248, 44 Am. St. Rep. 75.

See, also, State v. Hall, 114 N. C. 909, 19 S. E. 602, 28 L. R. A. 59, 41 Am. St. Rep. 822; The Salton Sea Cases, 172 Fed. 792, 814, 97 C. C. A. 214.

We do not think we need cite further authorities in support of this doctrine. It is the law of this circuit, established as appears upon full and careful consideration of all the cases, and should be followed, not only as binding authority, but upon sound reasoning and in the interest of an efficient administration of equal and exact justice.

[2] 2. We return now to the question before the court: Is the public press immune to the provisions of the statute under consideration? It is not made so by the language of the statute. Is it so by judicial construction?

In the case of In re Daniels (C. C. 1904) 131 Fed. 95, the petitioner, Josephus Daniels, was found guilty of contempt of court for the publication in his paper of an article criticizing the court for its action in the appointment of a receiver for a railroad company. The proceedings in the District Court for the appointment of the receiver had terminated, and the publication in no sense obstructed the administration of justice. Upon habeas corpus in the Circuit Court, that court, referring to the proceedings, said:

"The record does not show that the alleged misbehavior of the petitioner was in the presence of the court, or so near thereto as to obstruct the administration of justice; nor is there anything to show that the alleged misbehavior of petitioner interfered with the court, or that it tended in the slightest degree to disturb the orderly proceedings of the court."

The publication was manifestly not within the statute. But the court said, further, upon this subject:

"The inherent power of the court to punish for contempt is based upon the theory that it is essential that the court should possess ample authority to secure the free and unobstructed exercise of its functions in the enforcement of the law. Therefore it is only such acts as tend to interfere with the orderly proceedings of the court or with the due administration of justice that can be properly punished as a contempt of court."

The court said, further:

"There may be instances where the publication of editorials or other matter in newspapers would bring the author within the limitations of the statute. For instance, if a newspaper editor should publish an article concerning a trial which was being considered by a jury, and should send a copy of the paper containing such article to the jury, or a member thereof, during the progress of the trial, for the purpose of influencing them in their deliberations, it would present a question whether such conduct would not be misbehavior in the presence of the court, or so near thereto as to obstruct the administration of justice."

In the recent case of United States v. Toledo Newspaper Co. (D. C. 1915) 220 Fed. 458, a newspaper owned by the defendant company, and the managing editor of the paper, were charged with criminal contempt for the publication of certain articles in the paper calculated and intended to influence the court in its consideration of a pending case by giving the impression that a decision contrary to the wishes of the paper would not only be very unpopular in the community, but would be likely to be met with active opposition. The articles also gave encouragement to popular resistance to any order the court might make fol-

lowing such unpopular decision. In passing upon the question of contempt, the judge rendered a lengthy opinion, in which the facts of the case are recited and the law upon the subject elaborately reviewed by the citation of numerous cases in both the federal and state courts. The court found both the newspaper company and the managing editor guilty of contempt, and imposed a separate fine upon each.

Among the cases cited by the court in support of its judgment is that of Myers v. State, in the Supreme Court of Ohio in 1889 (46 Ohio St. 473, 491, 22 N. E. 43, 44, 15 Am. St. Rep. 638). A judgment of contempt had been entered in that case against the plaintiff in error in the court of common pleas of Franklin county (Columbus) for causing to be published in a daily newspaper in Cincinnati an article reflecting upon the judge of the court in which a case was then pending against the plaintiff in error. The article referred to this pending case, and it is stated that the newspaper had an extensive circulation throughout the state, including the county of Franklin, and was freely circulated, sold, and read about the courthouse and in the courtroom, all of which was known to the plaintiff in error at the time of the writing and publishing. The article was, in fact, read on the day of its publication by many persons in the courtroom and was much talked about within the bar of the court and within the presence and hearing of the court. The statute (section 5639, Rev. St. Ohio) provided that:

"A court, or judge at chambers, may punish, summarily, a person guilty of misbehavior in the presence of or so near the court or judge as to obstruct the administration of justice."

This is almost the identical language of the federal statute. The first question considered by the Supreme Court was whether the misbehavior of the plaintiff in error was in the presence of the court. Upon that question, the court said:

"Indeed, it was written in the city of Cincinnati, though dated at Columbus. But the publication was in the courtroom, as well as elsewhere. It was intended to have effect, and did have effect, in the courthouse at Columbus, and the writer was just as much responsible for that effect as though he had, in the courtroom itself, and while the trial was progressing, circulated and read aloud the article, or uttered the libelous words verbally. The acts were thus done, if not in the very presence of the court, at least so near thereto as to obstruct its business. * * * The statute clearly authorizes, as did the common law, courts to punish summarily, as contempts, acts calculated to obstruct their business. They could not be maintained without such power, nor could litigants obtain a fair consideration of their causes in a court where the jury or judge should be subject, during the trial, to influences in respect to the case upon trial, calculated to impair their capacity to act impartially between the parties."

In Patterson v. Colorado, 205 U. S. 454, 463, 27 Sup. Ct. 556, 558 [51 L. Ed. 879, 10 Ann. Cas. 689] this case is cited by the Supreme Court of the United States as an authority in support of the doctrine, that:

"When a case is finished, courts are subject to the same criticism as other people, but the propriety and necessity of preventing interference with the course of justice by premature statement, argument, or intimidation hardly can be denied."

The Supreme Court also cites to the same effect the case of Telegram Newspaper Co. v. Commonwealth, 172 Mass. 294, 52 N. E. 445, 44 L. R. A. 159, 70 Am. St. Rep. 280, where the trial court had adjudged two newspapers published in Worcester, Mass., in contempt for publishing articles dealing with and discussing the proceedings in a trial before the court upon the petition of one Loring against the town of Holden for the taking of land of the petitioner for the abolition of a grade crossing. The articles in the two papers which the court found were calculated to obstruct the course of justice in said court were substantially in the same language. In one of the articles it was stated that:

"The town offered Loring $80 at the time of the taking, but he demanded $250, and, not getting it, went to law."

The Supreme Court of Massachusetts, sustaining the judgment of contempt for this publication, said:

"The facts stated, even if they were true, were not admissible in evidence at the trial, * * * and, so far as appears, they were no part of the proceedings at the trial, and, if they were brought to the knowledge of the jurors before they rendered their verdict, were calculated to influence them upon the amount of the damages to be given by their verdict. The newspapers were published and circulated in Worcester, and it was not improbable at the time of publication that the articles would be read by some of the jurors before the trial of the petition was finished. * * * The intention of the publisher of a newspaper is that it should be bought and read by persons within the place where it circulates. Cases * * * should be determined on evidence presented in court. It is an inevitable perversion of the proper administration of justice to attempt to influence the judge or jury in the determination of a cause pending before them by statements outside of the courtroom, and not in the presence of the parties, which may be false, and even if they are true are in law not admissible in evidence."

In Rex v. Davies, 1 K. B. (1906) 32, the question was whether the King's Bench Division of the High Court of Justice had power to punish by attachment contempts of inferior courts. That question is not involved in this case. But the contempt charged was the publication by a newspaper of articles reflecting upon the character and antecedents of an accused person whose case was pending before the inferior court. The publication was very similar in character to the one in the present case. It was admitted, on behalf of the editor of the paper, who was cited to show cause why he should not be punished for contempt, that nothing could be said in his defense or in palliation of the act of publishing such articles concerning a person under remand upon a charge which might lead to a committal. The defense was wholly confined to denying the jurisdiction of the King's Bench. In determining this issue, that court referred to the publication of such articles as tending to poison the stream of justice and calculated to deprive the court of the power of doing that which is the end for which it exists, namely, to administer justice duly, impartially, and with reference solely to the facts judicially brought before it. The court in pursuing this thought found it necessary to ask itself this question:

"What, then, is the principle which is the root of and underlies the cases in which persons have been punished for attacks upon courts and interferences with the due execution of their orders?"

The court answered that:

The principle "will be found to be, not the purpose of protecting either the court as a whole or the individual judges of the court from a repetition of them, but of protecting the public, and especially those who, either voluntarily or by compulsion, are subject to its jurisdiction, from the mischief they will incur if the authority of the tribunal be undermined or impaired."

In support of this principle, the court refers to the judgment prepared by Wilmot, C. J., in Rex v. Almon (1765) Wilmot's Opinions, pp. 255, 256, a considerable part of which judgment, the court says, was "devoted to showing that the real offense is the wrong done to the public by weakening the authority and influence of a tribunal which exists for their good alone. * * * The several parts of the system [judicial], he adds, 'act in combination together to attain the only end and object of all laws, the safety and security of the people.'" The court examined the articles complained of, and found that they contained a number of statements respecting the person charged of a character likely to seriously prejudice her case, to create a feeling against her, and to affect the minds of persons who might take part in her trial. It was the opinion of the court that such a case demanded a severe punishment, and accordingly the editor was ordered to pay a fine of £100 and the costs of the proceedings.

3. We come now to the fundamental question in this case, which was also the fundamental question in the case of Patterson v. Colorado, 205 U. S. 454, 462, 27 Sup. Ct. 556, 51 L. Ed. 879, 10 Ann. Cas. 689. In that case the constitutional guaranty of the freedom of the press was invoked on behalf of a newspaper as against contempt proceedings. The contempt alleged was the publication of certain articles and a cartoon, which, it was charged, reflected upon the motives and conduct of the Supreme Court of Colorado in cases still pending, and were intended to embarrass the court in the impartial administration of justice. The court had ordered judgment fining the plaintiff in error for contempt. It was contended by the plaintiff in error in the Supreme Court of the United States that the law of contempt, as construed by the Supreme Court of Colorado, abridged the freedom of the press, as guaranteed in the First Amendment to the Constitution of the United States. The court, by Mr. Justice Holmes, answered this contention by saying that:

"The main purpose of such constitutional provisions [the First and Fourteenth Amendments] is 'to prevent all such previous restraints upon publications as had been practiced by other governments,' and they do not prevent the subsequent punishment of such as may be deemed contrary to the public welfare. * * * The preliminary freedom extends as well to the false as to the true; the subsequent punishment may extend as well to the true as to the false. This was the law of criminal libel apart from statute in most cases, if not in all."

The court continues:

"The rule applied to criminal libels applies yet more clearly to contempts. A publication likely to reach the eyes of a jury, declaring a witness in a pending cause a perjurer, would be none the less a contempt that it was true. It would tend to obstruct the administration of justice, because even a correct conclusion is not to be reached or helped in that way, if our system of trials is to be maintained. The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open

court, and not by any outside influence, whether of private talk or public print."

It thus clearly appears that the press is not exempt from the provisions of the statute under consideration. Liberty of the press is subordinate to the independence of the judiciary, and it is not expedient that any class in the community should be privileged to interfere with the rights of litigants or to embarrass or obstruct the administration of justice. 6 R. C. L. 510, § 22.

[3, 4] 4. It is next contended by the plaintiff in error that as the managing editor had no knowledge of the contents of the article or the intention of the reporter, Perkins, to cause the same to be published in the paper, it was error to hold him guilty of contempt of court. The specific charge was that the publication of the article was not based upon the facts adduced on the trial, but upon facts relating to the past life of the defendant; that they were highly prejudicial to his character and reputation; were inadmissible in evidence; prevented him from having a fair and impartial trial; and obstructed the administration of justice. The reply to this charge was that Campbell was charged with the editorial supervision of the paper; that he exercised reasonable care in the selection and employment of editors and reporters; and that it was his duty to exercise reasonable care that articles *reflecting upon the court* or in any manner tending to interfere with the administration of justice were excluded from the columns of the paper. It was not charged in the information or in the citation that the article *reflected upon the court,* and it was not alleged in the reply that it was the duty of the managing editor to exclude from the paper the contemptuous matter that was published and which did interfere with the administration of justice; but it was admitted that the article was printed without any editorial supervision. It was therefore clearly open to the court to find that the managing editor did not perform his duty in supervising the publication, and was negligent in permitting the article to be published; and, as the court found that the accusation in the information was true, we are of opinion that the alleged error is not one for our consideration. "On such a writ [writ of error] only matters of law are considered. The decision of the trial tribunal, court or jury, deciding the facts, is conclusive as to them." Bessette v. W. B. Conkey Co., 194 U. S. 324, 338, 24 Sup. Ct. 665, 671 [48 L. Ed. 997].

[5] 5. It is further contended that the contempt, if any, was a criminal one, and not civil; and that the costs which were incurred in the continuance of the criminal case should not have been considered in the judgment. The judgment is that:

"The Independent Publishing Company, a corporation, and the said Will A. Campbell, should be fined in the sum of $617.95, together with the costs of this proceeding."

The court had a broad discretion in considering the circumstances entering into the measure of punishment. The costs in the continued case were merely used as an element in measuring the fine imposed by the court, and did not change the case from a criminal to a civil one. The fine was plainly imposed to vindicate the authority of the court, and, as such, was fixed at an amount within its discretion.

The judgment of the District Court is affirmed.