### UNITED STATES v. SANDERS.

(District Court, W. D. Tennessee. W. D. June 26, 1923.)

No. 1305.

**1. Contempt ⊜⇒9—Power to punish for contempt of court inherent.**

Courts have inherent power to summarily convict and punish for contempt those responsible for articles published in reference to a cause pending, when such articles are calculated to interfere with the due administration of justice in such causes, and charges reflecting on the judicial integrity of a court with reference to a pending cause are deemed to directly tend to influence the court, and hence are contemptuous.

**2. Evidence ⊜⇒5(1)—Matters of common knowledge are judicially noticed.**

Matters of common knowledge are matters of judicial knowledge.

**3. Contempt ⊜⇒9—Article referring to arbitrary action of court in pending contempt proceeding held contempt of court.**

An article referring to a pending contempt proceeding against editor of labor paper, the article being entitled "The King Forbids," and indicating the writer's belief that the court was prejudiced and acting arbitrarily, *held* contempt of court, the defense of liberty of the press being untenable, and the question whether the article did or did not influence the court being immaterial.

**4. Contempt ⊜⇒2—Absence of intention to reflect on court to be considered only in mitigation.**

That the writer of an article which was in fact contempt of court had no intention of reflecting on the court can be considered only in mitigation of the offense.

Contempt proceeding by the United States against G. V. Sanders. Defendant adjudged guilty.

ROSS, District Judge. This is a contempt proceeding instituted by the United States, through the district attorney at Memphis, Tenn., against the defendant G. V. Sanders, as editor and publisher of a newspaper called the Memphis Press, published at Memphis, Tenn., by reason of a certain article appearing in said paper on September 7, 1922, entitled "The King Forbids," and which article was written relative to, and concerning the arrest of and the case then pending against one Jacob Cohen, as editor of a newspaper published at Memphis, Tenn., called the Labor Review. The case against the said Cohen was likewise a contempt proceeding instituted by the

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

United States, charging him with having violated a certain injunction issued out of this court in a case then pending which had been instituted by the Illinois Central Railway Company et al., commonly referred to as one of the "strike" cases.

The case against defendant Sanders proceeded in regular order to a hearing in open court, wherein the defendant appeared in person and by attorneys, admitted the writing of the article in question, but denied any intention to reflect upon the court, or that any disrespect for the court was entertained, either at the time of the writing of the article or at any other time. It was contended by the defendant in person and in his behalf that he was merely discussing what he conceived to be the constitutional rights of Cohen in writing the article which had brought about his arrest—that is, the arrest of Cohen—and that in the article written by the defendant he was exercising his constitutional rights and was protected by the constitutional provision guaranteeing the freedom of the press.

At the hearing permission was given for counsel for both the government and the defendant to file briefs. Briefs have been filed, and especially in behalf of defendant elaborate arguments have been made, and many authorities cited and discussed. A clear understanding of the case requires that the article in question should be copied herein. It is as follows:

### "The King Forbids.

"Memphis has been so excited these past few days over the arrest of assassins and would-be assassins that another very important matter has been overlooked by many. That is the arrest Monday of Editor Jacob Cohen of the Labor Review.

"Cohen's arrest is a shining example of the far-reaching nature of the injunction obtained at Chicago by U. S. Attorney General Daugherty. It was charged Cohen had used such words as "dirty scabs" and "industrial scavengers" in expressing his contempt for railroad strikebreakers. This is supposed to be a violation of the injunction.

"Maybe Editor Cohen didn't know that the king had forbidden such things to be said about the strikebreakers. True, the king would not have been offended had he used the same epithets in expressing his opinion of any other class. It was not the words so much as it was the persons at whom they were directed.

"True it would have been lawful to have used the same words just a few days ago, before the fiat of the king on that matter had gone out. But the fiat had gone out, and it was clearly up to all subjects to be up on the king's latest laws.

"Mr. Cohen possibly was not thoroughly up to date on questions of fundamental rights in this country of the free. No doubt he is one of those old-fashioned souls who believe there is something real in those words the Constitution contains about free speech and free press. He probably thought that antiquated doctrine would protect him in giving his opinion to the world.

"Ha! Ha! We shall see about that. Fetch him before the throne.

### "Where's the Stopping Place?

"If the courts can go that far in muzzling free press, where is the stopping place? Could there be any stopping place beyond that? If freedom of the press means anything at all in this country it means freedom of an editor to express his opinion on questions that are uppermost in the public mind.

"If a court can take away that right by an injunction, either the court is out of gear, or the Constitution. We prefer to think it is the court that is off its base.

"Since the arrest of Cohen it seems that the local U. S. district attorney has decided to prosecute him under the injunction issued by Judge Ross in the federal court here.

"It makes no difference whatever whether the injunction was issued in Chicago or, Memphis. ·

"Both are in America. ·

"Let us read a few lines from the Constitution of the United States, Here is the First Amendment:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech or of the press; or the right of the people peaceably to assemble and to petition the government for redress of grievances."

The contention of the government relative to this article is that, whether the intention actually existed to interfere with or influence the court in the trial and determination of the Cohen Case or not, the direct tendency of the article was to interfere with the court in the determination of the Cohen Case, or to influence the court in arriving at a conclusion in that case; that the article was certainly calculated to influence the court.

In behalf of the defendant it is insisted: (1) That the article had no reasonable tendency to obstruct the administration of justice. (2) That there was no direct obstruction nor any reasonable tendency to directly obstruct, the action of the court, and that such was necessary. That it was not a question of whether there was a mere possible obstruction or interference. (3) That under section 268 of the Judicial Code (Comp. St. § 1245) the rule governing federal courts is the same as that which governs or is applicable to the Congress of the United States when exercising its implied power to punish for contempt any person obstructing its action when engaged in the process of enacting legislation.

[1] The question here presented is one which has been much litigated, and about which there have been much written and many decisions of various tribunals, wherever there have been courts of justice or legislative bodies. Not all the decisions are in accord on the various phases presented by the many cases for contempt which have been considered, but upon one essential there is unanimity, and that is that the right of courts to punish for contempt in proper cases is a right necessary to the very existence of judicial institutions, and is inherent in every court of justice although certain limitations may have been prescribed by legislative enactment. This doctrine rests upon such sound reasoning that it would seem no comment is necessary. Were it not true, courts would be practically without protection, and instead of orderly procedure disorder would be the rule. And as was well said in Cooper et al. v. People of Colo. ex rel. Wyatt, 13 Colo. 337, 373, 22 Pac. 790, 6 L. R. A. 430:

Courts have "inherent power to summarily convict and punish, as for a contempt * * * those responsible for articles published in reference to a cause pending, when such articles are calculated to interfere with the due administration of justice in such cause. * * * The power to punish summarily in such cases is essential to the very existence of a court. The con-

trary rule would place it in the power of a vicious person to so conduct himself as to prevent any kind of a trial."

It is especially the latter part of this quotation which the court has in mind in making the observation just preceding the authority cited. The courts of the country occupy no such sacred positions or relations to society as that they are free from criticism, and it may be that frequently proper criticism should be more freely indulged. But the relation of courts to society is such as that improper criticism, unwarranted assertions, intentional or unintentional remarks concerning the actions or attitude of courts, whether spoken or written, which so reflect upon the dignity of the courts, as such, or their intentions concerning pending litigation, as to engender in the public mind disrespect for the judiciary, or disregard for its orders, its decrees, or its proceedings in general, must not go unnoticed. If such conduct should be permitted on the part of the public, soon not only the superstructure, but the very foundations, of our judicial system would be destroyed, aggrieved individuals would seek in vain for a forum wherein their rights might be protected or their differences amicably adjusted and the fabric of society would be rent in twain. Indeed, civilization would be wanting in one of its chief supports and the rights of the weak would be lacking in proper protection.

It is true only such matters as directly tend to influence the courts in their decisions can be considered as contemptuous utterances or conduct. But the observation of Judge Elliot in People ex rel. Connor v. Stapleton, 18 Colo. 568, 38 Pac. 167, 23 L. R. A. 787, is a strong answer to the question that might be propounded as to when such utterances influence courts.

In the case cited the learned jurist said:

"Judges are human. They are possessed of human feelings, and when accusations are publicly made, as by a newspaper article, charging them directly or indirectly with dishonorable conduct in a cause pending before them and about to be determined, it is idle to say that they need not be embarrassed in their consideration and determination of such cause. They will inevitably suffer more or less embarrassment in the discharge of their duties, according to the nature of the charges and the source from which such charges emanate. When a judge tries and determines a cause in connection with which public charges against his judicial integrity have been published, the public, as well as parties interested, are frequently led by the publication of the charges to distrust the honesty and impartiality of the decision, and thus confidence in the administration of justice is impaired. It is not only important that the trial of causes shall be impartial, and that the decisions of the court shall be just, but it is important that causes shall be tried and judgments rendered, without bias, prejudice. or improper influence of any kind. It is not merely a private wrong against the rights of litigants and against the judges. It is a public wrong, a crime against the state, to undertake by libel or slander to impair confidence in the administration of justice. That a party does not succeed in such undertaking lessens his offense only in degree."

That the courts of this country have the power to so govern their procedure, and protect themselves from unwarranted attacks which directly tend to interfere with an unbiased, impartial determination of matters pending, is well settled, and any detailed discussion of this phase of the case or the statute relative to the power of federal courts

to punish for contempts as embraced in section 268 of the Judicial Code is unnecessary here. In Marshall v. Gordon, 243 U. S. 522, 37 Sup. Ct. 448, 61 L. Ed. 881, L. R. A. 1917F, 279, Ann. Cas. 1918B, 371, a very learned opinion was delivered by Mr. Justice White, in which the history of this statute and this power of the courts is most interestingly discussed. This case and the cases of Patterson v. Colorado, 205 U. S. 454, 27 Sup. Ct. 556, 51 L. Ed. 879, 10 Ann. Cas. 689, and Toledo Newspaper Co. v. U. S., 247 U. S. 402, 38 Sup. Ct. 560, 62 L. Ed. 1186, put at rest many of the questions presented by the briefs of counsel for defendant.

Furthermore, that liberty of the press as guaranteed by the Constitution does not extend to that point where parties are permitted to publish articles concerning pending causes "which are reasonably calculated to interfere with the due administration of justice" has been almost universally determined. See authorities above cited and those cited by them, and State v. Morrill, 16 Ark. 384; People v. News Times Publishing Co., 35 Colo. 253, 84 Pac. 912; McDougall v. Sheridan, 23 Idaho, 191, 128 Pac. 954; State v. Shepherd, 177 Mo. 205, 76 S. W. 79, 99 Am. St. Rep. 624; Tate v. State, 132 Tenn. 131–138, 177 S. W. 69, and the many cases cited from practically every state in the union, England, British Columbia, and Canada as appearing in the note in 13 C. J. § 44, pages 34, 35. It is said in the text of the section last referred to that:

"The rule is now firmly settled that it is contempt to issue publications which are calculated to prejudice or prevent fair and impartial action in a cause of judicial investigation then pending, including those which seek to influence judicial action by threats or other forms of intimidation which reflect on the court, counsel, parties, or witnesses, respecting the cause or which tend to corrupt or to embarrass the due administration of justice."

Likewise a very pertinent statement appears in the text of 6 R. C. L. § 21, p. 509, wherein it is said:

"It is now a generally acknowledged rule that certain publications in newspapers may amount to contempts of court and may be summarily punished as such. A publication pending a suit reflecting upon the court, the jury, the parties, the officers of the court, or the attorneys, with reference to the suit, it having a tendency to influence the action of the tribunal before which the case is pending, * * * is a contempt of that court which may be summarily punished by attachment."

See, also, authorities cited in support of this text, and especially notes to 2 Am. Dec. 391; 97 Am. Dec. 629.

The language of section 268 of the Judicial Code relative to federal courts seems to be the same in the main and in many instances verbatim, as the language relative to the power to punish for contempts of the various state courts, so far as this court has had access to their Constitutions or statutes, and in Tennessee particularly is this true. But one case from Tennessee will be cited here, for the reason that that case so ably discusses the question of contempt, and so fully cites, quotes from, and construes other cases that the citation of other authorities from Tennessee is rendered unnecessary.

In Tate v. State, 132 Tenn. 131, 177 S. W. 69, at a time when one of the learned counsel for defendant was the Chief Justice of the

Supreme Court of Tennessee, it was announced (132 Tenn. on page 136, 177 S. W. on page 70), that:

"There can be no doubt of the right of courts to punish for contempt publishers of newspapers who, pending the trial of a case, print matter for public circulation which is calculated to impede, embarrass, or affect the orderly trial and disposition of the case being heard. * * * There is no dissension whatever in the authorities as to this power of the courts."

The principles governing the determination of this case being so well established, a review of the facts of the many cases cited would be of little avail in arriving at a correct solution of the question presented. The question then is: How do these principles apply, if at all, to the article written by defendant?

In analyzing this article, and in order to fully understand its purport, it is necessary to take into consideration the time when, the circumstances under which, and the matter about which it was written, for these three elements enter vitally into its proper construction.

[2, 3] It is a matter of common knowledge, therefore of judicial knowledge (Bouvier's Law Dic. vol. 2, p. 1734; Hunter v. N. Y., O. & W. Ry. Co., 116 N. Y. 615, 24 N. E. 9, 10, 6 L. R. A. 246; Brown v. Piper, 91 U. S. 37, 23 L. Ed. 200; Wynehamer v. People, 13 N. Y. 378, in which Comstock, J., says: "We must be allowed to know, what is known by all persons of common intelligence"), that at this particular date of September 7, 1922, a condition prevailed in this country which has seldom, if ever, had a parallel. Practically a half million men who had been engaged in the operation of the great arteries of transportation had voluntarily abandoned their labors, and in many instances open efforts were being made to prevent others from fulfilling the places of employment made vacant by those who had left their posts of duty. To such an extent had these controversies proceeded that the courts of the country were called into activity and by injunctive process had sought to restrain on the one hand those who in the first instance had voluntarily terminated their relations with their employers, and protect on the other hand those who had seen proper to accept employment in their stead. The public mind was inflamed. Riots were of almost daily occurrence. Disregard was being manifested in many quarters, and particularly in the locality where this article was printed, for the mandates of the courts, and to so great a degree did this attitude on the part of certain citizens of the country extend that the Attorney General of the United States deemed it proper to seek in behalf of the government an injunction, with which the courts and the public are practically alike familiar. During this period of unrest the editor of the Labor Review above mentioned published an article which was deemed by this court to be of sufficient gravity to warrant the court in having that editor brought before it for trial on a charge of having violated the injunctive process of this court. While that matter was pending the article in question was written.

Upon casual reading the article might appear innocent. It might be thought to be one containing some attempted humor, some sarcasm, and some serious argument; but upon more careful consideration the real purpose of the article becomes manifest. What was the object

of this article, or what could have been its object? Was it the intention of the defendant to calmly discuss constitutional questions? If so, why the ridicule, the invective? Was it that he felt a constitutional privilege was being entrenched upon? If so, why compare the courts in the manner to which they are referred in the article to a king? In this country the commonly accepted conception of a king is one possessing that arbitrary power which brooks no interference; one exercising an authority which listens not to reason, and which is swayed not by a calm consideration of the relative rights of parties; one whose word alone is law, and from whose edicts no appeal may be had. It must be presumed that the defendant was cognizant of this popular conception of monarchs, else why use the simile? Was it done out of respect for the court, or was it done to excite the public mind and cause the public in general to exercise a disrespect or a disregard for the decrees of the court, or for the court, as such, or to cause the public to resent the court's action in seeking to bring Cohen to trial? Did the defendant have in mind due respect for the court when he used the language:

"Maybe Editor Cohen didn't know that the king had forbidden such things to be said about the strikebreakers. True the king would not have been offended had he used the same epithets in expressing his opinion of any other class. It was not the words so much as it was the persons at whom they were directed."

What is the plain meaning of this? Is it not that he meant to be understood by the public as saying that the court was prejudiced against those called "strikers" and prejudiced in favor of those called "strikebreakers," so much so that the court took no offense at the words used, but only because of the fact that they were used concerning those in whose favor the court was prejudiced, and that Cohen was to be brought to trial, not because he had done any wrong, but because he had spoken against those favored unjustly by the court? Can any other reasonable meaning be imputed to these words, and do they not directly tend to array the public against the court, and the authority of the court, and do they not directly tend to bring about a disregard for the court's authority? Do they not directly reflect upon the sincerity, to say nothing of the dignity, of the court, and do they not challenge the honesty of purpose of the court in the action concerning Cohen? There can be but one answer to all this. And so it must be presumed it was the intention of the defendant to cast reflection upon the court in such way as that the court, fearful of how its acts might be regarded, fearful of public opinion, that element so dreaded by many, would temper its decrees in behalf of Cohen.

Again in the course of his article he says: "Fetch him before the throne." In other words, bring him before the individual whose power, as defined by Webster's Unabridged Dictionary, is that of one invested with supreme authority; or, again, to bring him before one who had arrogated to himself that degree of superiority that tolerated no opposition, and where favoritism and not justice would determine the issue. Was not this what he meant to infer and what he meant the public to understand?

It is said in behalf of defendant that this article was written of and concerning the injunction issued by Judge Wilkerson of Chicago. Be it so. However, it appears from the article itself that, after it was written, defendant was informed that Cohen was not to be brought to trial under that injunction, but on a charge of violating the injunction issued out of this court, and with this knowledge brought directly home to him, he prints the article with the statement:

"It makes no difference whatever whether the injunction was issued in Chicago or Memphis."

In other words, it is equivalent to his having said:

"If in the first instance all I have said was pertaining to the Chicago court, or the Chicago injunction, nevertheless it applies with equal force to the court at Memphis, in which Cohen is to be tried."

Suppose one were informed that A. had committed a certain act, and such one should use slanderous and vituperative language of and concerning A., and that immediately upon using such language such one should be informed that not A., but B., was the one who had committed the act, and thereupon such one should say, "It matters not, all I have said concerning A. applies equally to B.," would it be any less a slanderous utterance concerning B., because in the first instance it had not been applied to him? The answer is obvious. Can the defendant, then, escape the consequences of his act in writing the article in question by saying that when the major portion thereof was written he had in mind another court, but applies the article to this court with the statement above quoted? Certainly not. In fact, the fair inference from the article is that he understood at all times Cohen was to be tried in this court regardless of what injunction he was charged with having violated.

Great stress is laid by counsel for defendant on the constitutional guaranty of freedom of the press, and it may be observed in this regard practically the same arguments as used by counsel in this case have been made in a great majority of the cases reviewed wherein defendants have been held for contempt. But it must be so, and has been so uniformly held, that while the liberty of the press is to be jealously guarded, and at all times defended, it means liberty of the press within reasonable bounds, and that liberty of the press is subordinate to the independence of the judiciary. In re Independent Publishing Co., 240 Fed. 849, 153 C. C. A. 535, L. R. A. 1917E, 703, Ann. Cas. 1917C, 1084; 6 R. C. L. p. 510, § 22, in which latter section it is said:

"Liberty of the press must not be confounded with license or abuse of that liberty."

As was observed in the Cohen Case:

"It is true the Constitution guarantees to the citizens the right of free speech and the freedom of the press, but that means the right of free speech and the right of the freedom of the press within legitimate bounds. So every citizen is guaranteed the right of the pursuit of happiness. But if some one should become imbued with the idea that in the pursuit of happiness it was necessary that he should take another's property or that he should interfere with the legitimate rights or liberties of his neighbor, certainly he would be amenable to the law. So the freedom of the press must be exercised with due regard for the rights of others and the rights of the

public and within certain limited channels. Suppose that one, possessed of the idea that the freedom of the press should in no wise be restricted, should establish a newspaper, and in the exercise of his supposed constitutional rights he should publish all manner of treasonable utterances, or send out literature of a seditious or rebellious nature in an effort to stir up strife or foment a rebellion, it could not be said that he would not be amenable to the law because he was exercising what he conceived ·to be his constitutional guaranty."

Another quotation from the opinion in that case may not be inapposite:

"One engaged in the publication of a newspaper must certainly be presumed to have that degree of intelligence which would prompt him to pause and consider whether or not an article published would be in violation of an order of the court. And an editor, perhaps above all others, should be more careful to see that nothing goes out from his pen or from his press that would in any wise injure society. He has the privilege of having his thoughts and ideas sent forth to be read by the public in general. Therefore his object should be the upbuilding of society, the elevation of humanity, not its degradation, not the destruction of the rights of men. A great educational institution is the press, and its efforts should be directed along the paths of right rather than of wrong."

However, after all that may be said, freedom of the press stands on no higher ground than freedom of speech. There is no sanctity that may be attached to one that may not be claimed with equal authority by the other, and despite the fact that some seek to invest the press with a liberty not rightfully its own:

"A man who speaks in a newspaper has no greater right than he who speaks out of it. A newspaper is no sanctuary behind which a person can shield himself for breaking the laws of the land." King v. Root, 4 Wend. (N. Y.) 113, 21 Am. Dec. 102.

"We understand liberty of speech and of the press to imply, not only liberty to publish but complete immunity from legal censure and punishment for the publication, so long as it is not harmful in its character, when tested by such standards as the law affords." Cooley, Const. Lim. 422.·

In People v. Wilson, 64 Ill. 195, at page 231, 16 Am. Rep. 528, at page 547 the court said:

"This court has not the power, nor the desire to arrogate it, to direct or control the press, in its legitimate sphere. Freedom of speech, and of the press, should be most jealously guarded. The utmost latitude should be allowed for fair, full, and free review of the entire action of the courts. Just criticism may assail the opinions, especially their fallacy, and warn of their errors. The opinions of courts are not solemn edicts, to be blindly assented to, but subject to calm and fearless stricture. The good taste, the severity of language, the weapon to be employed, either reason or ridicule, must be determined by the writer. In popular governments, neither the public action nor officials' opinions or persons in positions of trust can be exempt from condemnation by the press or in the assemblages of the people. But there must be toleration, for error of opinion should always be tolerated, when reason is left free to combat it. This character of animadversion should never be regarded as a contempt of court. The freedom of·the press, however, is fully protected without licensing libel and ribaldry and charges of corruption and bribery against courts and their officers. Whatever the intent may be, though it may mitigate the offense, it cannot lessen the injury to character or undo mischief."

It is urged in behalf of defendant that there was no intention on his part to speak disrespectfully of this court and that he entertained the

highest regard for the courts of the country and for their decrees. Grant that the defendant is sincere in this insistence, yet it is not always the evident intention to which courts alone must look, but the question as to whether or not the publication "tended to obstruct justice," for if the article tended to obstruct justice, or was "calculated to influence the court" in the decision of the case about which it was written, the defendant would be liable, and this whether the article did in fact influence the court or not, and this question has been put at rest by the court in Toledo Newspaper Co. v. U. S., supra, in the following language:

"True, it is urged that, although the matters which were made the basis of the findings were published at the place where the proceedings were pending and under the circumstances which we have stated in a daily newspaper having large circulation, as it was not shown that they had been seen by the presiding judge or had been circulated in the courtroom, they did and could form no basis for an inference of guilt. But the situation is controlled by the reasonable tendencies of the acts done, and not by extreme and substantially impossible assumptions on the subject. Again, it is said there is no proof that the mind of the judge was influenced, or his purpose to do his duty obstructed or restrained, by the publications, and therefore there was no proof tending to show the wrong complained of. But here again not the influence upon the mind of the particular judge is the criterion, but the reasonable tendency of the acts done to influence or bring about the baleful result is the test. In other words, having regard to the powers conferred, to the protection of society, to the honest and fair administration of justice, and to the evil to come from its obstruction, the wrong depends upon the tendency of the acts to accomplish this result without reference to the consideration of how far they may have been without influence in a particular case. The wrongdoer may not be heard to try the power of the judge to resist acts of obstruction and wrongdoing by him committed as a prelude to trial and punishment for his wrongful acts."

[4] If there was no intention to reflect upon the court this can only be considered in mitigation of the offense. State v. Howell, 80 Conn. 688, 69 Atl. 1057, 125 Am. St. Rep. 141, 13 Ann. Cas. 501; In re Shortridge, 99 Cal. 526, 34 Pac. 227, 21 L. R. A. 755, 37 Am. St. Rep. 78. Also see In re Fite, 11 Ga. App. 665, 76 S. E. 397. Under the law and a construction of the article in question, determining its meaning by a fair interpretation of the language used, there can be no doubt that the article directly tended under all the circumstances surrounding its publication to influence the court.

Counsel for defendant have asked that separate findings of law and fact be filed by the court. In compliance with this request the court finds the law to be as above stated, and finds the facts to be as agreed by counsel in the stipulation of facts signed by them and filed in the case October 16, 1922. Furthermore the court finds as a fact:

1. That the defendant wrote the article in question.

2. That it was published in a newspaper under his control.

3. That at the time it was written the case of United States v. Jacob Cohen was pending and undetermined.

4. That the case against Cohen was one instituted by the United States, seeking to hold Cohen for contempt of court on a charge of having violated an injunction issued by this court in a case then pending in this court.

5. That the article in question, written by defendant, was intended to apply directly to this court, and did so apply.

6. That at the time this article was written there was in progress practically a nation-wide strike of railway employees in the United States; that at Memphis, where this court was at that time being held, and where Cohen was to be tried, the public mind was greatly agitated by reason of the strike, the attitude of the courts of the country, and general disturbances in connection with the operation of the railroads, and that all these matters were matters of common and judicial knowledge.

7. That the article in question directly tended to obstruct the administration of justice and influence the court in the determination of the Cohen Case.

However, whether those matters referred to as matters of common knowledge should be considered or whether they are taken into consideration, still the court finds as a fact that the direct tendency of the article in question was to obstruct the administration of justice and to influence the court in the determination of the Cohen Case.

The conclusion is inevitable that the defendant is guilty of contempt of the court and must be punished therefor. But by reason of the apology offered in court at the time the case was heard, and the repeated disavowals of the defendant of any intention to reflect upon the court, only a fine of $300 will be imposed and the defendant will be taxed with the costs of this proceeding. Unless the fine and costs are paid within five days, the defendant will be committed to the Shelby county jail for his failure to pay such fine and costs.

In view of the order in the Cohen Case, it may be well to state that the offense committed in this case is not an offense of such gravity as that charged against Cohen wherein there was a direct violation of the injunction issued by the court.

In addition to the authorities hereinabove cited, in a footnote hereto appended[1] are a number of other cases which the court has considered in connection with this case, but for the sake of brevity the styles of the cases are omitted

1 6 L. R. A. 430; 443; 97 Am. Dec. 632; 16 Am. Rep. 547; 99 Am. St. Rep. 624; 106 Am. St. Rep. 916; 68 L. R. A. 251; 43 L. R. A. 717; 10 Ann. Cas. 689; 6 L. R. A. (N. S.) 572; 20 Am. St. Rep. 248; 23 L. R. A. 787; 125 Am. St. Rep. 141; 13 Ann. Cas. 501; 16 Am. Rep. 528; 59 Am. Rep. 199; 40 Am. St. Rep. 282; 3 Ann. Cas. 761; 70 Am. St. Rep. 280; 44 L. R. A. 159; 99 Am. St. Rep. 624; L. R. A. 1916F, 132; 28 Am. St. Rep. 451; 50 Am. St. Rep. 568; 97 Am. Dec. 626; 60 Am. St. Rep. 596; 15 Am. St. Rep. 638; 8 L. R. A. 584; 1 Am. Dec. 246; 125 Am. St. Rep. 755; 17 L. R. A. (N. S.) 582; 106 Am. St. Rep. 916; 68 L. R. A. 251; 42 L. R. A. 717; 49 Am. Rep. 257; 8 L. R. A. 584; 83 Am. St. Rep. 531; 50 L. R. A. 195; 21 L. R. A. (N. S.) 905; 20 Am. St. Rep. 238; 23 L. R. A. 787; 16 Am. St. Rep. 528; 59 Am. Rep. 199; 68 Am. St. Rep. 281; 15 Ann. Cas. 638; 228 Fed. 787; 220 Fed. 458; 237 Fed. 986; 147 Fed. 947; 70 Am. St. Rep. 280; 44 L. R. A. 159; 117 Fed. 448; 54 C. C. A. 622; 87 U. S. 387; 107 Fed. 942.